**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **DAVID MATSON and BARBARA MATSON,** Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>**NIBCO INC.**<br><br>Defendant. | Case No. 5:19-cv-00717<br><br>CLASS ACTION COMPLAINT<br><br><u>Jury Trial Demanded</u> |

## CLASS ACTION COMPLAINT

Plaintiffs David Matson and Barbara Matson, individually and on behalf of all others similarly situated ("the Class"), by and through their attorneys, file their Class Action Complaint, and allege as follows against Defendant NIBCO, Inc.:

### I.       INTRODUCTION

1.       NIBCO Inc. ("NIBCO" or "Defendant") has manufactured and advertised its PEX Products for use in plumbing systems throughout the United States.

2.       This case concerns cross-linked polyethylene plumbing tubes (herein "PEX Tubing"), the brass fittings required to connect the PEX Tubing together (herein "PEX Fittings"), and the stainless-steel clamps (herein "PEX Clamps") required for joining the PEX Tubing and PEX Fittings. As discussed below, the PEX Tubing, the PEX Fittings and the PEX Clamps at issue are all manufactured or distributed by NIBCO and suffer from undisclosed design and/or manufacturing defects that inevitably cause them to fail prematurely.  They failed in the Plaintiffs' residential structure (home), and in all Class members' residential structures, in the same manner.

3.     NIBCO has repeatedly represented that consumers should trust it to provide the highest quality PEX Products because the company has over 100 years of industry experience and is an industry leader in the manufacture of PEX Products.

4.     NIBCO manufactures, warrants, advertises and sells the PEX Products at issue. NIBCO's sales catalog advertised that, *inter alia*, its PEX tubing was the highest quality PEX tubing available and that its cross-chemical bonding process gave it "superior characteristics."  NIBCO warranted that its PEX tubing would be free from any defects in materials and workmanship for a period ranging from ten (10) years to twenty-five (25) years, dependent upon whether NIBCO PEX fittings and NIBCO valves and installation accessories were also used in the installation.

5.     Contrary to these affirmative statements, the PEX Products suffer from design and/or manufacturing defects.  Specifically, and as a result of such defects, PEX Tubing is predisposed to premature oxidative failure and creep rupture, and have failed and ruptured; the PEX Fittings are predisposed to prematurely fail, and have failed, as a result of dezincification corrosion; and the PEX Clamps are predisposed to prematurely fail, and have failed, as a result of chloride-induced stress corrosion cracking (collectively, the "PEX Product Defects").

6.     NIBCO has systematically breached its warranty by failing to fully or adequately compensate Plaintiffs and Class members injured as a result of the PEX Product Defects.  NIBCO also failed to disclose this material information to Plaintiffs and Class members.

7.     Before manufacturing, warranting, advertising and/or selling the PEX Products, NIBCO failed to take appropriate steps to ensure that its products were adequate and safe for their intended use.  Defendant knew or should have known that the PEX Products were not suitable for use within water-carrying plumbing systems, and that the PEX Products suffered from the PEX Product Defects.

8.     The PEX Product Defects have caused plumbing systems to catastrophically fail and

2

release water, which has caused and will continue to cause Plaintiffs and the Class to incur damages to their residential structures through no fault of their own.  Moreover, Plaintiffs and Class members have suffered a diminution of the value of their residential structures.

9.      Plaintiffs seek relief for damages sustained by Plaintiffs and the Class that were proximately caused by the use of NIBCO's Defective PEX Products in Plaintiffs' and Class members' residential structures.  They seek relief to remedy NIBCO's breach of express warranty, breach of implied warranty, strict liability, negligence and unjust enrichment.  Plaintiffs and the Class additionally and alternatively seek declaratory and injunctive relief, as described below.

10.      Specifically, the PEX Tubing suffers from a design and/or manufacturing defect in the form of premature oxidative failure and creep rupture.  The PEX Fittings suffer from a design and/or manufacturing defect in the form of dezincification corrosion.  The PEX Clamps suffer from a design and/or manufacturing defect in the form of failure by chloride-induced stress corrosion cracking.  Unless specified otherwise below, the phrase "PEX Products" will collectively refer to Defendant's defective PEX Tubing, PEX Clamps and/or PEX Fittings.

11.      When any of these components fail, it leads to the release of water, which can cause significant damage to surrounding property and/or prevents the plumbing system from functioning as intended.

## II.      PARTIES

12.      Plaintiffs own a house located at Lot 36 in Block 13 of Redbird Ranch Unit 2-D, a subdivision in, Bexar County, Texas, per Deed Number 20090097914 that is filed in the Land Records of Bexar County (the "**Matson Home**").

13.      In December 2010, while Plaintiff David Matson was deployed to Afghanistan, he learned, through his wife, Plaintiff Barbara Matson, of a leak in the dry wall of the ceiling in the master bedroom.

3

14.     Plaintiff Barbara Matson sought immediate assistance from a neighbor, who patched the leak, and Plaintiff Barbara Matson contacted homebuilder DR Horton, who then had the leak further repaired, and the drywall patched and painted.  But no one disclosed the PEX Product Defects to Plaintiff Barbara Matson, who had no reason to suspect her home had been plumbed with defective products.  In fact, Plaintiffs and Class members would of course have had no way of initially even knowing NIBCO was the manufacturer of their plumbing.

15.     In May 2015, Plaintiffs discovered another water leak, this time in the garage. Plaintiffs attempted to mitigate the damage by patching the leak.  Unaware that their pipes were defective and causing the damage, Plaintiffs took no further action.

16.     In July 2017, Plaintiffs' home suffered another water leak, also in the garage ceiling but in a different location.  Plaintiffs attempted to mitigate the damage by applying a temporary patch.  When Plaintiffs shut off their water to fix the leak, the water heater sustained damages. Plaintiffs reported the water leak and water heater to builder DR Horton's agents.

17.     DR Horton's agent fixed the water heater, but since the pipe was patched, he took no further action.  However, he for the first time, disclosed to Plaintiffs that there was a widespread piping issue with the pipes selected and installed by DR Horton throughout the DR Horton-built homes within Plaintiffs' subdivision.  DR Horton told Plaintiffs about the existence of the widespread PEX piping issue.  On or about July 12, 2017, DR Horton's agent informed Mr. Matson that DR Horton was involved in an "investigation regarding the NIBCO manufactured tubing installed in some of [DR Horton's] homes."

18.     Plaintiffs researched and verified what DR Horton had told them; that Defendant's defective PEX pipes had been installed in many homes throughout Bexar County, Texas.  DR Horton's agent even addressed the issue to the local news, stating "We share in our homeowners' frustrations caused by this issue.  We are working diligently to address the homes affected and to

4

make any necessary repairs as quickly as possible.   The pipes, which are specific to one manufacturer, were purchased and installed by a third-party contractor between 2008 and 2012 and the leaks started several years later. We have been and will remain steadfast in our commitment to resolving the water pipe issue."  DR Horton, at that time, represented that it knew of "1000 homes in Bexar County" affected by leaks, and that it had "repaired or re-piped over 900 homes to date."

19.      Plaintiffs residential plumbing system was installed using NIBCO plumbing accessories, including NIBCO PEX Tubing, NIBCO PEX Fittings, NIBCO PEX Clamps and other installation accessories.

20.      To date, Plaintiffs have experienced significant damages on three separate occasions due to PEX Product Defects.   Plaintiffs have suffered an ascertainable loss as a result of Defendant's acts, omissions and/or misrepresentations associated with the PEX Products.

21.      Defendant NIBCO, Inc. is incorporated under the laws of the State of Indiana with its principal place of business located at 1516 Middlebury Street, Elkhart, Indiana 46515-1167.   In addition to the PEX Products previously described, NIBCO manufactures plumbing valves, plastic fittings and flow control solutions for commercial, industrial and institutional construction, and for the residential and irrigation markets.  NIBCO operates ten manufacturing plants in the United States, Mexico and Poland, and has more than 2,000 employees.

### III.        JURISDICTION AND VENUE

22.      This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiffs and members of the Class are citizens of a state (Texas) different than Defendant (Indiana). *See* 28 U.S.C. § 1332(d)(2)(A).

23.      This Court has personal jurisdiction over Defendant because NIBCO conducts

substantial business in Texas.  Defendant has sufficient minimum contacts with the State of Texas and intentionally avails itself of the consumers and markets within the State of Texas through the promotion and sales of its products, including its PEX Products.

24.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district, and because Defendant conducts substantial business in this judicial district.

## IV.      FACTUAL ALLEGATIONS

### A.  The Defective NIBCO PEX Products

25.     NIBCO sells various plumbing products including PEX Tubing, PEX Fittings, PEX Clamps and other plumbing accessories.

26.      NIBCO has been in business for over 100 years and has manufactured plumbing systems and parts for nearly as long.

27.     NIBCO states on its website that it is a "recognized leading provider of valves, fittings and flow control products for commercial, industrial and institutional construction as well as residential and irrigation markets."[1]

28.      PEX is an acronym for cross-linked polyethylene. Polyethylene (denoted by "PE") is the raw material and the letter "X" in the acronym "PEX" refers to the cross-linking "chemical bonding" of the polyethylene across its molecular chains.

29.     NIBCO touts its PEX tubing as possessing "superior characteristics" due to NIBCO's cross-linking process. Specifically, NIBCO states the following about its PEX manufacturing process:

> Cross-linking is the process that gives NIBCO DURA-PEX tubing its superior characteristics. The long, simple chains in a polyethylene molecule are altered to

---

[1] *About NIBCO,* http://www.nibco.com/About/ (last visited Oct. 5, 2018).

form a more stable, three-dimensional network. This process changes the material from a thermoplastic into a thermoset. A thermoset differs from a thermoplastic because a thermoset cannot be melted and then reformed. This change in molecular structure creates a polyethylene product with enhanced mechanical properties. Many manufacturers use a chemical additive to activate the cross-linking process, but NIBCO employs a sterile, electron beam process that provides superior properties. This process, which is called PEX-c, delivers the highest quality PEX tubing available today, while reducing the use of chemicals.[2]

## B.    NIBCO's Defective PEX Tubing

30.    Despite NIBCO's attestations to the quality and superiority of its PEX Tubing, consumers in certain and specific homes in Texas have experienced water damage and catastrophic PEX Tubing failures caused by slow growth cracking mechanisms consistent with oxidative failure and/or creep rupture. These slow growth cracking mechanisms have been caused by the insufficient stabilization and/or improper cross-linking of the PEX material used by NIBCO to manufacture its PEX Tubing.

31.    NIBCO's PEX Tubing comes with an express warranty that warrants against defects in the materials and workmanship of the tubing. Specifically, NIBCO's express warranty states, *inter alia*, the following:

> NIBCO Inc. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor. This 25- year warranty is voided if any non-NIBCO products are used in the PEX system. NIBCO INC. warrants NIBCO PEX tube, when used under normal conditions, use and service in potable water and radiant heat systems with brass insert fittings meeting NSF/ANSI 61, ASTM F1807 and ASTM F877 to be free from defects in materials and workmanship for a period ten (10) years form [sic] the date of purchase.[3]

32.    NIBCO has failed to fulfill its obligation to replace the defective PEX Tubing and

---

[2] *See* NIBCO, NIBCO® DURA-PEX® Piping Systems, Catalog C-PEX-0509, 4 (Apr. 29, 2009); see also NIBCO, NIBCO® PEX Piping Systems, Catalog C-PEX-1013, 4 (Oct. 1, 2013).
[3] A true and correct copy of NIBCO's PEX warranty is attached to the Complaint as Exhibit 1.

compensate Plaintiffs and Class members for the property damage it caused.

33.     To the extent that the NIBCO PEX Warranty purports to limit or eliminate certain contractual rights afforded to Plaintiffs (*e.g.,* on the type of recoverable damages, ability to recover property damages), such limitations are unconscionable and unenforceable under the circumstances.

**C.     NIBCO's Defective PEX Fittings and Clamps**

34.     In addition to its PEX Tubing, NIBCO also manufactures and sells the fittings, clamps, valves and installation accessories required to install a completed residential or commercial plumbing system.

35.     NIBCO manufactures and sells PEX Fittings that purportedly conform to ASTM standard F1807.

36.     The ASTM is a globally recognized organization (formerly known as the American Society for Testing and Materials) that develops international voluntary consensus standards. The F1807 standard applies to metal insert fittings for use with SDR9 cross-linked polyethylene (PEX) tubing, which is manufactured and/or sold by NIBCO.

37.     F1807 insert fitting systems typically use a crimped stainless steel or copper ring to secure the PEX tubing to the fitting. The brass alloy fitting is inserted into the PEX tubing using a special tool that crimps a copper ring or stainless-steel clamp around the outside of the tubing, which, in turn, creates a seal between the PEX tubing and the brass fitting.

38.     Not only does NIBCO manufacture and sell ASTM-F1807 fittings, but it encourages consumers to purchase and install the fittings with its PEX Tubing. NIBCO's express warranty covers 10 years if only its PEX Tubing is installed, but NIBCO increases its express warranty coverage to 25 years if its PEX Fittings, valves, and installation accessories are used in conjunction with its PEX Tubing.

39.     Defendant's ASTM-F1807 fittings are easily identified by a "NIBCO" stamp placed

8

on the brass insert fittings.

40.     NIBCO's PEX Tubing comes with an express warranty that warrants against defects in the materials and workmanship of the fittings. Specifically, NIBCO's express warranty (Exhibit 1) states, *inter alia*, the following:

> NIBCO Inc. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor.

41.     NIBCO has failed to fulfill its obligation to replace any defective fittings and compensate Plaintiffs and Class members for the property damage the PEX Fittings and Clamps caused.

42.     To the extent that the NIBCO PEX Warranty purports to limit or eliminate certain contractual rights afforded to Plaintiffs (*e.g.,* on the type of recoverable damages, ability to recover property damages), such limitations are unconscionable and unenforceable under the circumstances.

**D.      Failure of NIBCO's Defective PEX Fittings and Clamps.**

43.     Consumers who purchased and installed NIBCO's PEX Fittings and Clamps have experienced cracking and leaking of these products in their residential and commercial plumbing systems, causing water leaks that have caused, and will continue to cause, damage to their residential structures as a result of water leaks from the plumbing system.

44.     During the foreseeable and intended use, the NIBCO PEX Fittings are exposed to elements in residential and commercial plumbing systems which cause the NIBCO PEX Fittings to corrode and prematurely fail as the result of dezincification corrosion.

45.     After undergoing dezincification, which process begins as soon as water begins to flow through the plumbing system, the PEX Fittings begin to degrade, fail and become brittle, sponge-like and/or plugged.  As a result, a continuous network of tiny holes develops in the PEX

Fittings, allowing water to weep through the walls of the fitting.  Weakened fittings crack or break, causing water damage to Plaintiffs and Class members' residential structures. They also become plugged with corrosion causing a low water pressure condition. Corroded fittings may also allow chloride-rich water to weep through the wall of the fittings, wetting the adjacent stainless steel PEX Clamp and causing the PEX Clamp to fail due to chloride-induced stress corrosion cracking.

46.    Defendant knew or should have known that the PEX Fittings and/or stainless steel PEX Clamps they manufactured, marketed and/or sold were susceptible to this premature failure through dezincification corrosion and chloride-induced stress corrosion cracking respectively.

47.    The design, materials choices, and manufacturing practices of the brass fittings and stainless steel PEX Clamps marketed and sold by Defendant have created products  that begin to fail on their first day of use, even if properly installed in their intended environment.  Currently, Defendant advertises fittings that are "dezincification resistant."[4]

48.    The stainless steel PEX Clamps fail due to a fracture mechanism known as "chloride-induced stress corrosion cracking," which is caused by defective design and/or defective manufacturing by Defendant. For stress corrosion cracking to occur, a susceptible material must be simultaneously exposed to tensile stress and chlorides.  If any one of these three things (material susceptibility, tensile stress, or chlorides) is eliminated or sufficiently reduced, stress corrosion cracking cannot occur.

49.    The failing PEX Clamps are manufactured from a stainless-steel alloy that is known to be susceptible to stress corrosion cracking in the presence of chlorides, and these clamps are used in a design where simultaneous exposure to static tensile stress and chlorides is (or should have been) reasonably anticipated. Stress corrosion cracking could not occur in the PEX Clamps if the

---

[4] *See, e.g.*, http://www.nibco.com/Flexible-Piping-Systems/Bronze-Insert-Fittings/ (last visited Oct. 5, 2018).

clamps were manufactured from a material that is not susceptible to chloride-induced stress corrosion cracking. Alternate materials that are generally immune to chloride-induced stress corrosion cracking (exhibiting little or no susceptibility) and that are approved for plumbing applications in the United States were readily available at little or no additional cost at the time the failing clamps were manufactured.

50.     Additionally, the failing PEX Clamps are designed in a manner that allows tensile stresses to exceed the yield strength of the material during installation (meaning that the tensile stresses are so high that the clamp permanently changes shape during installation, through a process known as "necking"). The clamps are designed in such a way that the tensile stresses created during installation promote chloride-induced stress corrosion cracking, and the tensile stress condition is made even more detrimental by other aspects of the clamp design and/or manufacture (smearing of surface material, sharp edges, etc.). Stress corrosion cracking cannot occur in the absence of static tensile stress, so the PEX Clamps could not have failed in the manner that they did if commonly accepted principles of engineering design and manufacturing had been employed to sufficiently reduce tensile stresses.

51.     Chlorides are one of the most abundant compounds on the planet. They are routinely found in potable water, solder flux, masonry materials, concrete curing accelerants, perspiration, flame retardants, and numerous other materials routinely encountered in building construction. The presence of chlorides is (or should have been) reasonably anticipated and accounted for in the design and manufacture of the PEX Clamps.

52.     NIBCO acknowledges that liquid and paste fluxes for soldering applications of copper and copper-alloy fittings are corrosive and that they contain chlorides of zinc and ammonia.[5]

---

[5] *See* NIBCO, NIBCO® Copper Fittings, Catalog C-CF-0513, pg. 37 (May 9, 2013).

Additionally, NIBCO provides step-by-step brazing instructions to the installer.   These instructions specify the application of flux.  The final step requires that the finished brazed assembly be wiped with a rag until all flux is removed.[6]  NIBCO fails to warn against allowing chloride-rich flux to come into contact with the stainless steel PEX Clamp.  NIBCO knows or should have known that it is impossible to completely remove all traces of chloride-rich flux, and that by wiping the flux with a rag it is near certain that the chloride-rich flux will be smeared onto the adjacent stainless steel PEX Clamp.

53.     Additionally, NIBCO knows or should have known that chlorides from any source would be problematic for the stainless steel PEX Clamps.  NIBCO acknowledges that its PEX Clamps are "covered by international patents held by Oetiker International."  Oetiker warns that chloride-rich environments can be problematic for their PEX Clamps.  NIBCO fails to disclose or address these vulnerabilities.

**TOLLING OF THE STATUTE OF LIMITATIONS**

54.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.   Additionally and/or alternatively, Defendant is estopped from asserting a statute of limitations defense for the same reasons.  Plaintiffs and members of the Class could not have reasonably discovered the true, latent defective nature of the PEX Products until shortly before this class action litigation was commenced, both because of the hidden nature of the PEX Product Defects and because of Defendant's failure to disclose those defects.

55.     Defendant was and remains under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of its defective PEX Tubing, PEX

---

[6] *See Id.* pg. 47.

Clamps, and/or PEX Fittings, and the fact that they suffer from the PEX Product Defects which cause them to fail.  As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

56.     Moreover, Plaintiffs' and Class members' claims were tolled by *Cole v. NIBCO, Inc.*, 13-cv-7871 (D.N.J.)  Plaintiffs and members of the Class were included in the class definition in *Cole* up to and through preliminary approval of a class-wide settlement in that action.  For reasons unknown to the Plaintiffs, however, they and those similarly situated to them were ultimately excluded from the settlement without notice of the pendency of the lawsuit itself, or the settlement.[7]

## V.     CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this suit as a class action pursuant to FED. R. CIV. P. 23(a), 23(b)(2) and 23(b)(3), on behalf of the following Texas class:

> All Persons that own or have owned at any time since January 1, 2005, a residential structure that (a) was constructed by Continental Homes of Texas L.P. (including, but not limited to, those for which the plumbing contracting was performed by or on behalf of Christianson Air Conditioning and Plumbing, LLC) and located in the following cities in Texas:  Boerne, Cibolo, Converse, Live Oak, Medina County, New Braunfels, Rouse City, San Antonio, San Marcos, Schertz, Sequin, and Universal City, and (b) contains or contained NIBCO PEX Products.

58.     Included in the Class are the Person's spouses, joint owners, heirs, executors, administrators, mortgagees, tenants, creditors, lenders, predecessors, successors, trusts and trustees, and assigns.

59.     Excluded from the Class are any  builder, contractor, distributor, seller, subrogated insurance carrier, or other person who has claims for contribution, indemnity or otherwise against NIBCO based on claims for leaks of the PEX Products with respect to such current or former owners

---

[7] Non-party DR Horton intervened in *Cole*, and filed an objection based upon its claim to represent the interests of homeowners such as Plaintiffs.  As a result, the plaintiffs in *Cole* excluded all Texas and Alabama homeowners from the settlement of that action, leaving Plaintiffs and members of this putative Class unrepresented and unprotected.

of such residential structures.  This exclusion specifically includes, but is not limited to, Continental Homes of Texas, L.P., DR Horton, and Christianson Air Conditioning and Plumbing, LLC.

60.     Also excluded from the Class are (i) NIBCO, its officers, directors, affiliates, legal representatives, employees, successors and assigns, and entities in which NIBCO has a controlling interest; (ii) judges presiding over this litigation; and (iii) local, municipal, state, and federal governmental entities.

61.     Plaintiffs reserve the right to re-define the Class prior to class certification.

62.     The rights of each member of the Class were violated in a similar fashion based upon Defendant's uniform actions.

63.     This action has been brought and may be properly maintained as a class action for the following reasons:

a.     Numerosity: Members of the Class are so numerous that their individual joinder is impracticable.  The Class contains thousands of members.

b.     Existence and Predominance of Commons Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class.  These questions predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

i.     Whether Defendant's PEX Tubing, Fittings and/or Clamps were defectively designed and/or manufactured for their intended purpose.

ii.     Whether Defendant's PEX Tubing, Fittings and/or Clamps were fit for their intended purpose.

iii.     Whether Defendant's PEX Tubing, Fittings and/or Clamps were merchantable.

iv.     Whether Defendant failed to warn consumers that its PEX Tubing,

Fittings and/or Clamps were not properly tested during the design and development process.

v.   Whether Defendant made fraudulent, false, deceptive, and/or misleading statements in connection with the sale of its PEX Tubing, Fittings and/or Clamps in its product literature, including those relating to standards and reliability.

vi.   Whether Defendant omitted material information when it sold its PEX Tubing, Fittings and/or Clamps.

vii.   Whether Defendant exercised reasonable care in the design, manufacture, and testing of its PEX Tubing, Fittings and/or Clamps.

viii.   Whether Defendant owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of its PEX Tubing, Fittings and/or Clamps.

ix.   Whether Defendant breached its duty to Plaintiffs and the Class by designing, manufacturing, advertising, and selling to Plaintiffs and the Class defective PEX Tubing, Fittings and/or Clamps.

x.   Whether Defendant's PEX Tubing, Fittings and/or Clamps deteriorated at an accelerated rate.

xi.   Whether Defendant's PEX Tubing, Fittings and/or Clamps failed prematurely.

xii.   Whether Defendant knowingly sold or allowed its PEX Tubing, Fittings and/or Clamps to be distributed after it knew the PEX Tubing, Fittings and/or Clamps were failing at an increased rate.

xiii.   Whether Defendant knew or should have known of the defective nature of its PEX Tubing, Fittings and/or Clamps.

xiv.    Whether Plaintiffs and the Class are entitled to relief under Defendant's express warranties.

xv.    Whether Defendant breached its contracts with Plaintiffs and the Class.

xvi.    Whether Defendant breached the terms of its express warranty.

xvii.    Whether Defendant breached applicable implied warranties.

xviii.    The appropriate nature of class-wide equitable relief.

xix.    The appropriate measurement of damages to award to Plaintiffs and members of the Class.

xx.    Whether the Defendant should be required to notify all Class members about its Defective PEX Products.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the Class own Defendant's defective PEX Products. Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries arising out of Defendant's wrongful conduct by, *inter alia*, buying defective products, suffering damage to their residential structures, and paying more for the PEX Products than they otherwise would have had they been aware of their defects. Plaintiffs are bringing the same claims and legal theories on behalf of themselves and all Class members.

d.    <u>Adequacy</u>: Plaintiffs are adequate representatives of the Class because they will fairly and adequately represent the interests of the Class, whose interests are fully aligned; they have retained counsel experienced and skilled in complex class action litigation;

16

and they will prosecute this action vigorously.

      e.    <u>Superiority</u>: A class action is superior to other available means of fair  and efficient adjudication of the claims of Plaintiffs and members of the Class.  It is manifestly desirable to concentrate this litigation in a single court, in this District.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for all members of the Class to individually and effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  By contrast, the class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously and without duplication of evidence, effort and expenses.  In sum, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  This Court will encounter no difficulties in managing this case as a class action.

      f.    <u>Ascertainability</u>:  Class members are readily ascertainable and can  be identified by Defendant's records. Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole, pursuant to FED. R. CIV. P. 23(b)(2).

## VI.       CAUSES OF ACTION

**COUNT I:**       **BREACH OF EXPRESS WARRANTY**
             **Texas Business & Commerce Code Sec. 2.313**

64.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

65.     As an express warrantor and manufacturer and merchant, Defendant had certain obligations under Texas Bus. & Comm. Code Sec. 2.313 to conform to its express warranties.

66.     Defendant's PEX Products contained an express warranty with every purchase.  A true and correct copy of such warranty can be found in Exhibit #1 to this Complaint.  NIBCO warranted that the PEX Products would be free from defects in materials and workmanship and such warranty became part of the basis of the transaction between Plaintiff and the Class and Defendant.

67.     Defendant's express warranty states its PEX Products will be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor and when installed along with NIBCO PEX fittings and NIBCO valves and installation accessories.

68.     Defendant's express warranty states its PEX Tubing will be free from defects in materials and workmanship for a period of ten (10) years from the date of purchase if installed by a licensed professional contractor.

69.     Defendant expressly warrants that if a consumer's PEX Products are defective, Defendant will replace them free of charge for all Class members.

70.     Plaintiffs and the Class complied with the terms of Defendant's express warranty, including any and all conditions precedent and all obligations owed to NIBCO related to installation of the PEX Components, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.  In addition, Defendant was put on notice of the

18

defect because it had knowledge of the existence of the PEX Product Defects at all relevant times.

71.     Contrary to the terms of the express warranty, Defendant has failed to replace the defective PEX Products purchased by Plaintiffs and the Class.  Defendant's actions and failures to act have voided any attempt on its part to disclaim liability for its actions.

72.     The representations in the express warranty were part of the "basis of the bargain" to such a uniform extent that class certification is appropriate under Rule 23(b)(3) for the breach of that of express warranty.

73.     As a result of Defendant's conduct, Plaintiffs and Class members have suffered an ascertainable loss in the form of direct monetary losses because, *inter alia*, Defendant has caused damage to residential structures, including without limitation, the difference in value of the PEX Products as represented and as delivered, and the diminution in value of their homes

**COUNT II:          BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Texas Business and Commerce Code Sec. 2.314**

74.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

75.     At all times mentioned herein, Defendant manufactured and/or supplied the PEX Products, and prior to the time the PEX products were purchased and installed by and in Plaintiffs' and the Class members' residential structures, Defendant impliedly warranted to Plaintiffs and Class members, and to Plaintiffs' and Class members' agents, that the PEX Products were of merchantable quality and fit for the use for which they were intended.

76.     A warranty that the PEX Products were in merchantable quality and condition is implied by law pursuant to Texas Bus. & Com. Code Sec. 2.314.  Plaintiffs and the Class are, at a minimum, intended third-party beneficiaries of contracts between Defendant and homebuilders and/or contractors, neither of whom were intended to be the ultimate users of the PEX Products and

have no rights under the warranties pled in this Complaint, which were designed and intended for Plaintiffs and the Class.

77.     The PEX Products were unfit for their intended use and were not of merchantable quality, as warranted by Defendant, but instead contained the PEX Product defects.  Specifically, and as a result of such defects, the PEX Tubing is predisposed to premature oxidative failure and creep rupture, the PEX Fittings are predisposed to prematurely fail as a result of dezincification corrosion, and the PEX Clamps are predisposed to prematurely fail as a result of chloride-induced stress corrosion cracking. These defects have caused the PEX Products to fail to perform when put to their intended use.

78.     Defendant breached the implied warranty of merchantability, as the PEX Products were not of a merchantable quality due to the PEX Product defects.  Plaintiffs and the Class seek the difference in the actual value of the PEX Products and the value as warranted.  *See* Texas Bus. & Com. Code Sec. 2.714(b).  Here, the damages sought by the Plaintiffs and the Class are not rooted in the alleged defect of the PEX Products, but in the fact that they did not receive the benefit of their bargain.

79.     Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

80.     As a direct and proximate result of the breach of said warranties, Plaintiffs and the Class suffered and will continue to suffer damages as alleged herein in an amount to be determined at trial.

**COUNT III:          STRICT LIABILITY DESIGN DEFECT, MANUFACTURING DEFECT AND FAILURE TO WARN**

81.     Plaintiffs and the Class incorporate by reference each preceding and succeeding

paragraph as though fully set forth herein.

82.     Defendant designed and manufactured the PEX Products, and sold or distributed the PEX Products to Plaintiffs and the Class.

83.     For the reasons, and in the manner, stated in this Complaint, The PEX Products were defective in their design, and were defective when they left Defendant's possession or control.  The PEX Products were likewise defectively manufactured, and posed a substantial likelihood of harm when they left that possession or control.

84.     Defendant knew, or should have known, that the PEX Products contained a non-obvious danger in their material composition.  Defendant knew that the PEX Products were highly susceptible to failure under expected installation conditions and ordinary use, and that consumers would not replace their PEX Products without an instruction to do so.

85.     Defendant failed to inform Plaintiffs and the Class as to the PEX Products' susceptibility to failure. Defendant failed to warn consumers that it was necessary to replace the PEX Products, even if the PEX Products had not yet failed, because they inevitably eventually fail.

86.     The PEX Products were defective due to inadequate warnings, inadequate inspection and testing, and inadequate reporting regarding the results of quality control testing, or lack thereof.

87.     Had Plaintiffs and the Class been adequately warned concerning the likelihood that the PEX Products would fail, they would have taken steps to avoid damages by replacing the PEX Products or by not purchasing them.

88.     Defendant, after learning that its PEX Products would degrade and fail, had a post-sale duty to warn consumers of the possibility that leaking and water damage could result from the failure of its PEX Products, even when used for their intended purpose.

89.     Defendant is strictly liable for the injuries that the defective PEX Products have caused Plaintiffs and the Class.

90.     As a direct and proximate result of the defective condition of the PEX Products, Plaintiffs and the Class have incurred damages in an amount to be determined at trial.

## VII.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, on behalf of themselves and the Class, that this Court:

A.     Enter an Order certifying the Class as defined above and designating Plaintiffs as Class representatives and Plaintiffs' counsel as counsel for the Class;

B.     award all damages to which Plaintiffs and Class members are entitled;

C.     award pre-judgment and post-judgment interest on such monetary relief;

D.     grant appropriate injunctive and/or declaratory relief as the Court may deem reasonable;

E.     award reasonable attorneys' fees and costs; and

F.     grant such further and other relief that this Court deems appropriate.

## VIII.     JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Austin Tighe

**NIX PATTERSON, LLP**
3600 N Capital of Texas Highway
Suite B350
Austin, Texas 78746
(512) 328-5333 (telephone)
Austin Tighe
State Bar No. 20023900
atighe@nixlaw.com

22

**DUGGINS WREN MANN & ROMERO LLP**
600 Congress Avenue, Ste. 1900
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300 (telephone)
Robert E. Linkin
State Bar No. 00795773
rlinkin@dwmrlaw.com

**DuBOIS, BRYANT & CAMPBELL, LLP**
303 Colorado Street, Suite 2300
Austin, TX  78701
(512) 457-8000 (telephone)
J. David Rowe
State Bar No. 00794564
drowe@dbcllp.com

**GRABLE GRIMSHAW PLLC**
1603 Babcock Road
Suite 118
San Antonio TX  78229
(210) 963-5297 (telephone)
Brandon J. Grable
State Bar No. 24086983
brandon@g2.law
Matthew Grimshaw
State Bar No. 24086983
matt@g2law

***ATTORNEYS FOR PLAINTIFFS***
**David Matson and Barbara Matson, Individually,
and on Behalf of All Others Similarly Situated**