

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DAVID MATSON, BARBARA MATSON, and YOLANDA GARRET**, Individually and on behalf of all others similarly situated, | § § § § | |
| | § | |
| *Plaintiffs*, | § § | |
| | § | Civil Action No. 5:19-cv-00717 |
| v. | § | |
| | § | |
| **NIBCO, Inc.**, | § | |
| | § | |
| *Defendant*. | § | |

<u>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS-ACTION SETTLEMENT AGREEMENT**</u>

The Matson and Garrett Plaintiffs ("Plaintiffs" or "Class Representatives") on their own

behalf, and on behalf of all those similarly situated (the "Class") request this Court enter an Order

that grants: (i) final approval of the Parties' Class-Action Settlement Agreement; and (ii) Plaintiffs'

application for Class Representative Service Awards.[1]

**I.**

<u>**INTRODUCTION**</u>

Plaintiffs seek an order finally approving the proposed Class Action Settlement (the

"Settlement"). Empirically speaking, the Settlement is outstanding and deserves approval by the

Court. In order for the Court to do so however, it must first satisfy itself that:

- Adequate notice was provided to the Class;

- The Settlement itself is fair, adequate, and reasonable; and

---

[1] Undersigned Class Counsel previously submitted its Motion for Approval of Class Counsel's Attorney fees, in accordance with the Court's Order Granting Preliminary Approval of the Class Action Settlement. *See* Dkt Nos. 78 and 68.

- Certification of the Settlement Class satisfies the requirements of Rule 23.

The evidence and argument below demonstrate each are easily satisfied.

First, notice provided to the Class easily satisfies the due process requirements imbedded within Rule 23. The Notice program, created and implemented in conjunction with Angeion (the Settlement and Claims Administrator in *Cole v. NIBCO*, the prior class action to which this case is related), was designed and intended to reach the maximum number of Class members. This process was assisted greatly by the fact that the address for each structure included in the Settlement Class was already known and compiled during the *Cole* litigation and thus was sent direct notice of this Settlement. Additionally, Angeion's *Cole* experience enabled it to improve upon what was already a successful supplemental indirect Notice program – and which a prior federal district court already considered to meet the due process requirements of Rule 23.

Second, the Class clearly meets all of the requirements for certification pursuant to Rule 23. Specifically, (i) the Class consists of more than 8,000 Class members, and thus numerosity is satisfied; (ii) there are numerous common contentions among Class members such that commonality is demonstrated; (iii) the Plaintiffs' claims are typical of those of the Class Members; and (iv) both Plaintiffs and their counsel easily satisfy the adequacy of representation requirement because there is no conflict between Plaintiffs and Class members, the Settlement includes myriad structural safeguards, and counsel have decades of experience prosecuting complex class action matters. Finally, there is no question common issues predominate over individualized issues, and the resolution of this matter as a class action is clearly superior to individualized actions, which would waste valuable party and judicial resources.

Third, the Settlement is fair, adequate, and reasonable. The relief provided by the Settlement is meaningful and designed to pay a minimum and maximum percentage of qualifying

damages (rather than a specific dollar amount). Moreover, it exceeds the relief provided for in the judicially approved *Cole* settlement in a number of material respects.[2] Most notably, the Settlement provides the following benefits:

- A settlement fund in the amount of up to $7,650,000.00, with additional upside value as explained herein;

- Payment to eligible Settlement Class members of a minimum of 50% and up to 75% of their "Reasonably Proven Property Damage" which per the Settlement Agreement includes repair or replacement of NIBCO PEX as a result of a Qualifying Leak, the repair or replacement of other property damaged as a result of a Qualifying Leak, and material and labor costs necessary to restore the affected property or structure to its condition prior to the Qualifying Leak;[3]

- A re-plumb remedy such that Settlement Class members who have suffered Multiple Qualifying Leaks may exercise the option to obtain a re-plumb of their entire residence or structure.[4] Such eligible Class Members shall receive up to 75% of the cost of their re-plumb, with an initial payment of 50%;

- Discounted services by preferred plumbing providers in Texas and Alabama (who have performed numerous re-plumbs in each of these relevant communities) at an approximate 15% discount from the standard rates those providers would otherwise charge homeowners. Accordingly, the true value of the settlement fund is potentially as much as $8,797,500 (if one considers this a 15% premium on the maximum $7,650,000 fund), along with other benefits like financing for out-of-pocket expenses associated with the re-plumb;[5]

- Settlement Class Members eligible for a re-plumb also will have the option to select a one-time payment of $3,000 in lieu of a re-plumb payment;

- An efficient claims process to access the relief provided for by the Settlement, and the process through which such Claims may be submitted also provides for submission of proof electronically through a settlement website designed for such purpose.

- Attorney's fees and expenses paid by NIBCO over and above the Class Settlement Fund.

---

[2] The settlement in *Cole* was finally approved by the United States District Court for the District of New Jersey on April 11, 2019.

[3] *See* Dkt. No. 50-1 at ¶10a.

[4] *See id.* at ¶10b.

[5] *See* Dkt. No. 50-1 at Exhibits 5-7.

Importantly, each of the above listed features of the Settlement significantly exceeds the relief provided for in the judicially approved *Cole* settlement. In particular, *Cole* provided a minimum of 25% and a ceiling of 70% for damage reimbursement (compared to 50%-75% here); did not provide Class members the option to alternatively receive a one time lump sum cash distribution in lieu of the re-plumb remedy; did not provide for negotiated discounted plumbing rates from preferred plumbing providers familiar with Class homes; nor the separate payment of attorneys' fees and expenses by NIBCO such that the settlement fund would not be diminished by the payment of such fees and expenses. In fact, on a *pro rata* basis, the settlement fund created by the Settlement is anywhere from 5 to 8.4 times larger than the settlement fund finally approved by Judge Wolfson in *Cole*—which was itself an outstanding result for the *Cole* class members. Finally, the merits of the Settlement are borne out by the reaction of the Class members following Notice. Only 30 Class members out of more than 8,000 have chosen to opt-out of the Settlement (or less than ½ of one percent of the Class), and only a single objection has been filed.[6]

In short, there is no impediment to final approval, and as such, the Court should grant final approval to the Settlement, certify the Class for the purpose of effectuating the Settlement, maintain continuing jurisdiction over this action for purposes of administration of the claims process, and grant Class Counsel's request for a reasonable service award for Plaintiffs in recognition of their valuable efforts taken on behalf of the Class. Plaintiffs request the Court enter

---

[6] Of the 30 opt-outs received, all 30 were submitted by Counsel for the *Williams* Plaintiffs as was the single objection by Class member Jose Garcia ("Garcia") (addressed *infra*). As this Court is aware, the *Williams'* counsel's actions in soliciting opt-outs through unauthorized, misleading and coercive communications led to Plaintiffs and Defendant jointly seeking curative notice and sanctions. This Court granted that relief in part (declining to impose sanctions), and as a result, only 30 of the previous 415 Class members whose opt-outs had been submitted by *Williams'* counsel have chosen to resubmit such a request in light of the Court's curative notice.

the Proposed Final Approval Order, Proposed Order Granting Reasonable Class Representative Service Awards, and Proposed Final Judgement attached as composite Exhibit A.

## II.
### OVERVIEW OF THE LITIGATION AND PROCEDURAL HISTORY

In this action, Plaintiffs brought claims against NIBCO for (i) breach of express warranty (Count I), (ii) breach of implied warranty of merchantability (Count II); and (iii) strict liability design defect, manufacturing defect, and failure to warn (Count III). These claims were based upon Plaintiffs' allegation that NIBCO is liable to Plaintiffs and the Class for damages resulting from undisclosed design and manufacturing defects in NIBCO's cross-linked polyethylene plumbing tubes ("PEX Tubing"), the brass fittings required to connect the PEX Tubing ("PEX Fittings"), and the stainless-steel clamps ("PEX Clamps") required for joining the PEX Tubing and PEX Fittings (collectively the PEX Tubing, PEX Clamps, and PEX Fittings are "Covered Products"). Plaintiffs alleged the above defects caused the Covered Products to fail prematurely, resulting in repeated leaks which cause and caused damage to Plaintiffs' and Class members' real and personal property.

Specifically, Plaintiffs alleged that contrary to the warranties and promises made by NIBCO that its Covered Products would be free from defects in materials and workmanship and last ten to 25 years, PEX Tubing is predisposed to premature oxidative failure and creep rupture; PEX Fittings are predisposed to prematurely fail as a result of dezincification corrosion; and PEX Clamps are predisposed to prematurely fail as a result of chloride-induced stress corrosion cracking.[7]

NIBCO denies that it is liable to Plaintiffs and the Class, raised numerous defenses to

---

[7] *See* Amended Complaint at Dkt. No. 33.

Plaintiffs' claims, and instead asserts the failures related to the Covered Products are the result of the actions of others, including, but not limited, to installation errors.

NIBCO's Covered Products have been the subject of litigation since at least 2013, including in Texas, Alabama, and several federal courts. These claims have been extensively litigated in each of these forums. As noted above, claims concerning the same alleged defects in the Covered Products were the subject of protracted litigation for more than five (5) years in the class action captioned *Cole v. NIBCO*, Case No. 13-cv-7871 (D.N.J.). That case was finally settled in 2019, but as explained below, the *Cole* settlement – which received final court approval on April 11, 2019 – excluded Plaintiffs and the members of the Settlement Class.

A.    <u>**The Texas Litigation**</u>

On April 10, 2018, Plaintiffs Barbara and David Matson initiated their first lawsuit by filing a Texas state court petition against builder DR Horton in Bexar County, Texas after experiencing multiple plumbing leaks in their home. On April 24, 2018, DR Horton filed a third-party claim against NIBCO, after which the Matson Plaintiffs amended their petition to include NIBCO. Shortly thereafter, Plaintiffs engaged in extensive discovery and fact investigation (which included discovery of materials produced in other litigation involving the same claims involved here), and both Matson Plaintiffs were deposed. On June 19, 2019, Plaintiffs filed their Original Complaint in the instant action choosing instead to seek relief on a class-wide basis, while simultaneously nonsuiting their state court action which had been brought in their individual capacity only.

During the pendency of litigation in this Court, Plaintiffs have engaged in both "on-docket" and extensive "off-docket" litigation activities. With regard to the "on-docket" activity,

Plaintiffs filed their class action complaint on June 19, 2019.[8] Defendant moved to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6).[9] Thereafter on April 27, 2020, Plaintiffs filed their amended complaint, which, *inter alia*, added an Alabama subclass and clarified the basis for Plaintiffs' claims.[10] On July 10, 2020, Defendant again moved to dismiss the Amended Complaint.[11]

With regard to the extensive "off-docket" activity, Plaintiffs reviewed the discovery conducted in the first *Matson* action, including discovery produced in *Cole*, analyzed Defendants' Motion to Dismiss the Amended Complaint, researched relevant authorities, and began developing argument and theories in response to the Motion to Dismiss. Additionally, Plaintiffs and Defendants engaged in "arms'-length" negotiations for more than a year prior to reaching an agreement in principle. Those negotiations included numerous in person, telephonic, and Zoom settlement conferences. Plaintiffs and Defendants spent hundreds of hours reviewing data concerning the Class homes, including the timing and frequency of such leaks. Those analyses undergirded the negotiations that culminated in a full-day mediation on September 16, 2020 before experienced mediator Ross Hart, Esq. (the mediator who also resolved the *Cole* litigation), which was ultimately successful and led to the instant Settlement.

### B.    The Alabama Litigation

Separate from the Texas litigation, on July 18, 2019, Yolanda Garrett filed her initial complaint in the United States District Court for the Northern District of Alabama in a matter captioned *Garret v. NIBCO*.  NIBCO moved to dismiss her complaint on September 30, 2019,

---

[8] *See* Dkt No. 1.
[9] *See* Dkt. No. 14.
[10] *See* Dkt. No. 33.
[11] *See* Dkt. No. 38.

and Plaintiff Garrett responded with a First Amended Complaint on October 21, 2019. On November 4, 2019, NIBCO again filed a motion to dismiss. On November 14, 2019, Plaintiff Garrett filed her response in opposition to NIBCO's motion to dismiss, and on November 25, 2019, NIBCO filed its reply. Thereafter, Plaintiff Garrett sought leave and filed her sur-reply to the motion to dismiss. On May 28, 2020, without reaching the merits of the motion to dismiss, the Court terminated the motion and ordered Plaintiff to file a Second Amended Complaint.

With regard to "off-docket" activity, Plaintiff Garrett engaged experts to examine and test the Covered Products at issue, and likewise spent untold hours working with those experts on issues related to the manufacturing of the Covered Products, the failure of the Covered Products, and the water damage to the home, home structure, and personal property of Plaintiff Garrett and Alabama class members. Garrett coordinated with Plaintiffs in this action and fully participated in the September 2020 mediation, as well as numerous other settlement conferences with NIBCO.

C.     **The *Cole* Litigation**

The *Cole* litigation which involved claims concerning the same alleged defects in the Covered Products alleged by Plaintiffs here and in the *Garrett* action in Alabama, was initiated in the District of New Jersey in 2013 and litigated before the Honorable Freda Wolfson. The class definition used in the *Cole* complaint and amended complaint included Plaintiffs and members of the Class in this action (including Garrett).[12] Plaintiffs and other current and former owners of

---

[12] The *Cole* class in the original complaint and amended complaint was defined as:

> All persons or entities who sustained damages proximately caused by NIBCO's Defective PEX Products used in the water plumbing systems of Plaintiffs' and Class members' homes and other structures, or which otherwise were installed in the homes and structures of Plaintiffs and the Class and require remediation.

The *Cole* class was further defined to include state subclasses which generally used the same definition listed above and which included both an Alabama and Texas subclass.

homes in the certain Alabama and Texas communities at issue in this action and *Garrett* were subsequently excluded from the settlement class definition in *Cole*.[13] Thus, Plaintiffs and Class members continued to suffer from the leaks and damages from the alleged leaks in the Covered Products but stood to receive no relief from the *Cole* settlement. Moreover, in light of recent Supreme Court authority which has brought both class action and cross-jurisdictional tolling into question, Plaintiffs and Garrett stepped-in to protect the Class members from losing any right to recover against NIBCO as a result of expiring statutes of limitations. In doing so, Plaintiffs have actually secured a Settlement that exceeds the judicially-approved recovery accomplished in *Cole* in several material respects—including those highlighted above and in Plaintiffs' Motion for Preliminary Approval.[14]

---

[13] The settlement class definition in *Cole* specifically excluded from its settlement class the residential structures that are part of the Settlement Class in this action:

> . . . Occupant Persons with respect to residential structures constructed by D.R. Horton, Inc.-Birmingham (including, but not limited to, those for which the plumbing contracting was performed by or on behalf of Dupree Plumbing Co. Inc.) and which are located in the following cities in Alabama: Bella Vista; Bessemer; Birmingham; Calera; Chelsea; Cottondale; Hoover; Kimberly; Leeds; Maylene; McCalla; Montgomery; Northport; Odenville; Pinson; Pratville; Springville; Trussville; and Tuscaloosa. Also excluded from the Settlement Class are Occupant Persons with respect to residential structures constructed by Continental Homes of Texas, L.P. (including, but not limited to, those for which the plumbing contracting was performed by or on behalf of Christianson Air Conditioning and Plumbing, LLC) and which are located in the following cities in Texas: Boerne; Cibolo; Converse; Live Oak; Medina County; New Braunfels; Royse City; San Antonio; San Marcos; Schertz; Seguin; and Universal City. A list of such residential structures in Alabama and Texas covered by this exclusion will be provided to the Settlement Administrator and made available on the Settlement Website. Also excluded from the Settlement Class are D.R. Horton, Inc.-Birmingham, Dupree Plumbing Co. Inc., Continental Homes of Texas, L.P., and Christianson Air Conditioning and Plumbing, LLC, solely with respect to the structures identified in that list.

[14] *See* Dkt. 50 at pp. 12-14.

## III.
### NOTICE

Throughout the approval process, Class Counsel has taken every possible step to ensure the Class received the best notice practicable under the circumstances presented here. Indeed, because of the nature of this Class – each of the structures at issue was known to parties – the Settlement Administrator was in a unique position to reach an unusually large percentage of the Class members through the Notice program. To that end, Class Counsel retained Angeion Group to serve as the Administrator with regard to both notice and the claims submission process for Class members. Angeion is not only recognized as a national leader in the field of class action administration, but is also serving as the administrator for the *Cole* settlement. As such, Angeion was able to build upon a series of efficiencies it learned through its work on *Cole*.[15]

Specifically, Angeion designed and implemented a Notice program intended to reach the maximum number of Class members and accomplished the following:

- The Notice and Claim Form (collectively, the "Notice") was mailed on March 25, 2021, to each address on the Class list (consisting of 8,085 structures) via the United States Postal Service ("USPS") first-class mail, postage prepaid.[16]

- The Notice was e-mailed on March 25, 2021 to 48,545 decision makers at homeowner's insurance companies.[17]

- On March 25, 2021, Angeion launched a Programmatic Display Advertising campaign through numerous digital platforms targeting audiences most likely to contain Class members through the use of demographic and socio-economic factors such as age, gender, income level and homeownership, resulting in a reach of 81.91% of potential Class members, which well exceeds the benchmark 70% set forth in the Federal Judicial Center Guidelines.[18]

---

[15] *See* Dkt. 50-3 at ¶¶ 9-11.

[16] *See* Declaration of Steven Weisbrodt, Esq of Angeion Group, LLC Re: Notice Procedures ("Weisbrodt Decl.") attached as Exhibit B, at ¶¶7-9.

[17] Id. at ¶10.

[18] *See* id. at ¶¶11-13. *See also* Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide for Judges," at 27 (3d Ed. 2010).

- On March 25, 2021 and again on April 8, 2021, Angeion published Notice through six (6) specific regional editions of *USA Today*, each containing a ¼ page advertisement.[19]

- On March 25, 2021, Angeion established a Settlement Website at www.alabamatexaspexsettlement.com, which contains general information about the Settlement, including important deadlines and copies of all relevant court documents (which are available for downloading). In addition, the Settlement Website includes a Claim portal which allows Settlement Class members to file claims electronically. Moreover, Class members are able to access a "Contact Us" tab or page on the Settlement Website where they are able to submit emails with additional questions to a dedicated email address. As of the date of this submission, the Settlement Website had been visited by 4,476 unique visitors during 6,006 sessions and with 9,470 page views.[20]

- Finally, on March 25, 2021, Angeion established a 24/7 toll free number utilizing interactive voice response to provide Class members with responses to questions, information about filing claims, and other relevant information. Additionally, Class members had the ability to speak with a live representative during normal business hours.[21]

The above described Notice thus provided Class members with the "best notice practicable under the circumstances, including individual notice to all members who could be identified through reasonable effort" which is all that is required by Rule 23(c)(2).[22] Moreover, from a substantive perspective, the Notice itself apprised Class members of the "terms of the settlement agreement in a manner that allowed class members to make their own determination regarding whether the settlement serves their interests."[23] Simply, the Notice contained "information

---

[19] Weisbrodt Decl.at ¶15.
[20] Id. at ¶¶16-19.
[21] Id. at ¶19-20.
[22] Fed. R. Civ. P. 23(c)(2); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974) (holding due process requires the best notice practicable).
[23] *U.S. v. Alabama*, 271 Fed. Appx. 896, 901 (11th Cir. 2008) (citations omitted).

reasonably necessary to make a decision to remain a class member and be bound by the final judgment."[24] Suffice to say, Notice here met the requirements of Rule 23.

# IV.
## THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

Prior to its evaluation of the Settlement and exercising its discretion to certify the Settlement Class, the Court should first be satisfied that all the requirements of Rule 23 are met.[25] Here, the Court has already conditionally certified the Class for the purposes of granting Preliminary Approval and providing Notice.[26] As demonstrated below, that determination should not be disturbed—because all of the requirements of both Rule 23(a) and 23(b)(3) are plainly satisfied.

### A.  Rule 23(a) is Satisfied

Each of the four requirements of Rule 23(a) (*i.e.*, numerosity, commonality, typicality, and adequacy) are easily satisfied by the Class.

#### 1.  Numerosity

The Settlement Class clearly satisfies the numerosity requirement of Rule 23(a)(1). The approximate number of Settlement Class members is known and includes at least 8,000

---

[24] *See* Weisbrodt Decl. at ¶36
[25] *See Amchem Prods., Inc. v. Windsor*, 521 US 591, 613 (1997) (the court must first determine whether the elements of rule 23(a) are satisfied); *see also* MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE (ELEVENTH) §5.1 (2014) (court must next determine whether class is maintainable under Rule 23(b)).
[26] *See.* Dkt. 68 at p. 2-4.

homeowners in Texas and Alabama. Each of these Settlement Class members owned structures which included the Covered Products.

2.  Commonality

Rule 23(a)(2)'s commonality element requires Plaintiffs to show that "there are questions of law and/or fact common to the class."[27] As the Supreme Court noted in *Walmart v. Dukes*, "[t]hat language is easy to misread, since any competently created class complaint literally raises common questions."[28] Thus reciting common questions alone is not enough to obtain class certification. Rather "[c]ommonality requires the plaintiff to demonstrate the class members have suffered the same injury."[29] In other words, Class member claims must "depend upon a common contention."[30] That in turn means that, in order to satisfy Rule 23(a)'s commonality requirement, the common contention "must be of such a nature that it is capable of class wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."[31]

Here, the claims of Class members depend on just such a common contention. The central issue in this case was whether the Covered Products at issue are defective. That contention turns on a common answer about the design and/or manufacture of the product that is either true or false for each and every member of the Class. In other words, Plaintiffs asserted that the validity of Class member claims can be determined in a "single stroke." Other common questions subject to a common answer include whether NIBCO knew of the alleged defects, whether NIBCO breached

---

[27] *See* Fed. R. Civ. P. 23(a)(2).
[28] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotations and citations omitted).
[29] *Id.* at 350.
[30] *Id.*
[31] *Id.*

its Limited Warranty, and the many other common questions identified in the operative complaint. And that is all that is required to satisfy the commonality element.

### 3.  Typicality

Like "commonality, the test for typicality is not demanding. It 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'"[32] Where as here, the legal theories underlying the Plaintiffs' claims are precisely the same as the theories which underly the claims of the Class—*i.e.*, Plaintiffs' contention that they were damaged by defectively designed and/or manufactured Covered Products—the typicality requirement is easily met.[33]

### 4.  Adequacy

Finally, to determine whether Plaintiffs "will fairly and adequately protect the interest of the class," as required by Rule 23(a)(4), "the court must find [Plaintiffs], their counsel, and the relationship between the two are adequate to protect the interests of absent class members."[34]

Here, Class Counsel collectively have decades of experience in prosecuting large class actions and have successfully represented individuals and classes in numerous complex matters.[35] They are well qualified to conduct the litigation and their results speak for themselves. Moreover, the named Plaintiffs' legal and remedial theories are substantially similar to those of other members of the Class and as a result, the Settlement does not involve any compromise of the interests of some Class members to the interests of others.[36] Specifically, the claims and damages

---

[32] *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).

[33] *Id.*

[34] *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

[35] *See* Declaration of Robert E. Linkin ("Linkin Declaration"), attached as Exhibit C, at ¶7.

[36] The single objector to this Settlement (represented by *Williams'* Counsel) asserts that a conflict exists between Plaintiffs and absent class members who have not yet (and may never) experience a leak from Covered Products. This argument, which is at best specious, is dealt with in Section VIII *infra.*

suffered by Plaintiffs are exactly the same claims held by, and damages suffered by absent class members. As a result, there are no conflicts between the interests of Plaintiffs and those held by Class members, or the nature of the relief sought.

Moreover, Plaintiffs are well-informed, have participated heavily in the litigation by directing the efforts of Class Counsel, and the relationship between Class Counsel and Plaintiffs are adequate to protect the interests of absent class members.

### B.  Rule 23(b)(3) is also Satisfied

In addition to the requirements of Rule 23(a), Plaintiffs must also satisfy Rule 23(b)(3)'s predominance element—under which Plaintiffs have proceeded here. Rule 23(b)(3) requires common issues predominate over individualized issues, such that class wide treatment of claims is appropriate.[37] Here that clearly is the case. The single dominant question for all Class members is whether NIBCO's Covered Products were defectively designed and/or manufactured. This contention can be proven on a class-wide basis, without meaningful individualized issues that predominate over the common issues.

Rule 23(b)(3) also requires the Court find that certification of the Class is "superior to other available methods for the fair and efficient adjudication of the controversy."[38] This requirement is also easily satisfied here. Clearly, class-wide resolution of these claims is far more efficient than requiring approximately 8,100 Class members to file and prosecute individual actions, all of which are based upon the same factual and legal theories, and which individually do not involve large enough damages to justify the cost of piecemeal litigation. Indeed, class-wide treatment and approval of the Settlement provide the Class with substantial benefits, while limiting the risks,

---

[37] *See* Fed. R. Civ. P. 23(b)(3).
[38] Id.

costs, and delays of litigation. As such certification is superior to other available methods of resolving the claims of the Class.

Finally, when assessing predominance and superiority, the Court may consider that the Class will be certified for settlement purposes only, and that a showing of manageability at trial is not required.[39] Accordingly, the Court should not disturb its conditional certification of the Class and should finally certify the Class for purposes of settlement.

### C.  The Court Should Appoint Class Counsel

Under Rule 23(g), "a court that certified a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class."[40] In making this determination, the Court must consider counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class.[41] The Court previously determined in connection with preliminary approval that Nix Patterson, LLP, Munck Wilson Mandala, LLP, Dubois Bryant & Campbell, LLP, Grable, Grimshaw Mora, PLLC, and Riley, Farris, & Pitt, LLP are qualified to represent the Class.[42] The undersigned counsel submit this determination should not be disturbed considering each of the above law firms has (1) diligently worked to protect Class members left unprotected by the *Cole* settlement; (2) experience in handling class action and other complex-commercial litigation matters; (3) demonstrated knowledge of the applicable law; and (4) committed all the resources necessary to represent and

---

[39] *See Amchem*, 521 U.S. at 618 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tired, would present intractable management problems, s*ee* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.").
[40] *See* Fed. R. Civ. P. 23(g)(1)(A)(B).
[41] Id.
[42] *See* Dkt. 68 at 4.

protect the Class.[43] Accordingly, each of the above firms request the Court appoint them Class Counsel under Rule 23(g).

## V.
### THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

To approve the Settlement this Court is required to determine that it is "fair, adequate, and reasonable, and not the product of collusion between the parties."[44]

In the Fifth Circuit, the Court's analysis is conducted by reviewing six key points of analysis, known as the *Reed* factors, to guide the Court's determination.[45] Those factors are:

(i)      The existence of fraud or collusion behind the settlement;

(ii)     The probability of plaintiffs' success on the merits;

(iii)    The range of possible recovery;

(iv)    The complexity, expense, and likely duration of the litigation;

(v)     The stage of the proceedings and the amount of discovery completed; and

(vi)    The opinion of class counsel, class representatives, and absent class members.[46]

As demonstrated below, each of the *Reed* factors favors approval of the Settlement.

### No Fraud or Collusion

The Settlement was entered into only after extensive, arms'-length negotiations which took place over the course of a year. Those negotiations included numerous in person, telephonic, and

---

[43] *See* Linkin Decl. at ¶¶6-9. Each of the firms representing the Class were also required to expend untold time and resources in order to protect absent Class members from *Williams'* counsel's misleading and coercive campaign to "blow up" the Settlement and solicit opt-outs through improper and unauthorized use of solicitation communications. Indeed, Class Counsel was required to engage in multiple, complex rounds of briefing and attend two (2) half-day evidentiary hearings seeking curative notice to Class members that would provide them with the required information needed to make an informed decision regarding their participation in, and support for the Settlement.
[44] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (*citing Young v. Katz*, 447 F.2d 431 (5th Cir. 1971)); *see also Duncan v. JP Morgan Bank, N.A.*, 2016 WL 4419472, at *7 (W.D. Tex. May 24, 2016).
[45] *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).
[46] *Id.*

Zoom settlement conferences. Ultimately, resolution required mediation on September 16, 2020 before Ross Hart, Esq. (the mediator who also resolved the *Cole* litigation).[47] Mediation was ultimately successful in that it led to an agreement in principle regarding a potential settlement. It was at the mediation that the parties agreed to the creation of a common fund in the amount of $7.65 million for the benefit of the Class. Then, after mediation, in a process that took several months and protracted negotiations, Class Counsel focused on negotiating additional benefits for the Class as part of a potential settlement (*i.e.*, the size of initial payments to Class members filing claims, the negotiation of agreements with preferred plumbing service providers in both Texas and Alabama to perform re-plumbing services for eligible Class members, including significant discounts for plumbing services and available financing terms for Class members).[48] Only then, and after agreement on every material component related to relief for the Class was reached, did the parties agree to a Settlement. Thereafter, the parties discussed for the first time, the manner in which Class Counsel would be compensated (subject to this Court's approval). Then, *and only then*, did Class Counsel and Defendant reach agreement as to a separately paid Class Counsel fee to be approved by this Court, such that Class Members would not be taxed in any way by the payment of attorney's fees—including for the work Class Counsel will continue to perform through the multi-year administration period called for by the Settlement.[49]

Given the above, there can be no question that the Settlement was reached through a process which was free from fraud or collusion among the parties. Indeed, the fact that the negotiations were arms'-length and conducted with the assistance of a neutral mediator weighs

---

[47] *See* Linkin Decl. at ¶11.
[48] *Id.* at ¶12.
[49] *Id.* at ¶13.

heavily in favor of such a finding.[50] Moreover, throughout these proceedings both the Class and Defendant have been represented by counsel experienced in complex class action litigation. Finally, no Class member, other than the single objection solicited by *Williams'* counsel, has objected to the Settlement, and even that objection does not raise fraud or collusion as an objection.[51]

Accordingly, the first of the *Reed* factors clearly weighs in favor of final approval of the Settlement.

<u>Probability of Plaintiffs' Success on the Merits</u>

When compared to the probability of Plaintiffs' success on the merits were this matter to proceed to trial, the Settlement is unquestionably an outstanding result. First, there were several defenses raised by Defendant, any one of which potentially could have resulted in an adverse result for the Class at either Summary Judgment or trial.[52] For example:

- Class members faced significant statutes of limitations defenses on virtually all of their claims which were particularly risky in light of the pendency of the *Cole* litigation, and a growing trend in courts (including the U.S. Supreme Court and courts in Alabama and Texas) to disfavor *American Pipe* tolling and/or cross jurisdictional tolling for state law claims asserted in a federal court class action;[53]

- Class members faced significant defenses regarding whether their claims under NIBCO's written Limited Warranty would fail based on the need to show reliance on the terms of the warranty to demonstrate the "basis of the bargain" requirement; and questions concerning whether the defect alleged here is covered by the "materials and workmanship" Limited Warranty;

- Class member claims faced significant defenses based upon the Economic Loss Rule Doctrine, which if successful, could have severely limited Class Member damages at trial, including foreclosing recovery for replacement of the NIBCO

---

[50] *See Welsh*, 2018 WL 7283639 at *12 *citing Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *4 (N.D. Tex. Apr. 25, 2018) and *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (both nothing neutral mediator is a factor weighing in favor of non-collusiveness).
[51] *See Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004).
[52] *See* Linkin Decl. at ¶15.
[53] *See China Agritech, Inc. v. Resh*, 138 S.Ct 1800 (2018).

Covered Products themselves and/or repairs for water damage to adjacent areas of the home (which is now provided for by the proposed Settlement);

- Class members faced significant "failure to warn" defenses with regard to Texas-based claims of design defect; and

- Class member claims would have required multiple experts at trial on such topics as material sciences, rates of oxidation and failure, and statistical analysis (with regard to likely future plumbing leaks and damages models).[54]

Against that backdrop, the Settlement is an unquestionably excellent result. Settlement Class Members with qualifying claims (*i.e.*, Class Members who have suffered unreimbursed damages from qualifying leaks or who qualify for a re-plumb remedy), will receive between 50% and 75% of their damages. Respectfully, such a result is rarely achieved in non-class litigation and is almost never seen in the context of class action settlements. Accordingly, this *Reed* factor also weighs heavily in favor of final approval of the Settlement.

<u>Range of Possible Recovery</u>

Given the range of possible recovery from litigation, the benefits of the Settlement also favor final approval by the Court. In examining this *Reed* factor the Court is required to "determine the value of the settlement in light of the potential for recovery."[55] And when reviewing the possible range of recovery, "a court should keep in mind that 'compromise is the essence of settlement.'"[56] This is "because a settlement must be evaluated taking into account the uncertainty and risks involved in litigation and in light of the strength of the claims and possible defenses."[57] Indeed, when determining "whether a settlement is fair given the potential range of recovery, the Court is guided by the fact that a proposed settlement only amounts to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and

---

[54] *See* Linkin Decl. at ¶¶ 16-17.
[55] *Welsh*, 2018 WL 7283639, at *13 (internal citations omitted).
[56] *Id.*(*citing Turner v. Murphy Oil USA, Inc.*, 472 Supp.2d 830, 850 (E.D. La. 2007)).
[57] *Id.* (internal citations and quotations omitted).

should be disapproved. . . . Indeed, a satisfactory settlement could amount to a hundredth or even a thousandth part of a single percent of the potential recovery."[58]

Here, the Court's determination is not nearly so close a call. While Plaintiffs ran the risk of a "zero" result, or a significant reduction of Class damages due to Defendant's economic loss rule defense, the Settlement provides a minimum recovery to Settlement Class members with qualifying claims of 50% of the damages they might have received by "shooting the moon," on their claims, with an expectation that Settlement Class members may receive an uplift up to 75% of their claimed damages.[59] Additionally, for those Settlement Class members with sufficient qualifying leaks, the Settlement provides a re-plumb remedy with the additional option of utilizing discounted services by preferred plumbing providers in Texas and Alabama at an approximate 15% discount from their standard rates offered to homeowners, such that the actual value of the Settlement for Class members who chose this option exceeds both the 50% floor and 75% ceiling.[60]

---

[58] *Welsh*, 2018 WL 7283639, at *13 (internal citations and quotations omitted).
[59] *See* Linkin Decl. at ¶¶18-19.
[60] *See* Linkin Decl. at ¶20.

There is no question the Settlement's results compare favorably to the potential range of recovery from a fully litigated matter.

Finally, it goes without saying that the Court here should also be guided by Judge Wolfson's final approval of the *Cole* settlement, which itself was an excellent result, and which this Settlement either meets or exceeds in every material respect.[61]

Accordingly, this *Reed* Factor also weighs heavily in favor of final approval of the proposed Settlement.

<u>Complexity, Expense, and Likely Duration of Litigation</u>

The fourth *Reed* factor requires the Court to consider "the vagaries of litigation" by comparing "the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation."[62] Here, the uncertainties of this case are clearly outweighed by the excellent results produced by the Settlement.

First, Plaintiffs and the Class faced an uncertain path given the number of potentially fatal defenses Defendant was prepared to raise through trial. In particular, even assuming Plaintiffs could overcome each of these defenses prior to trial, in order to succeed, Plaintiffs would be required to demonstrate their claims through the presentation of complex expert testimony on such topics as material science and rates of degradation, as well as complex statistical analysis.[63]

Second, even assuming Plaintiffs and Class members could navigate the uncertain path before them, the journey would likely have taken years. Given the nature of Class member

---

[61] *See Cole v. NIBCO,* 13-cv-07871-FLW-TJB (D.N.J.), Dkt. No. 227.
[62] *Dehoyas*, 240 F.R.D. at 291.
[63] *See* Linkin Decl. at ¶21.

claims—*i.e.*, potential leaks caused by PEX Products – Class members simply could not wait so long.[64]

In contrast, the Settlement provides Class members with immediate help now, which is a significant achievement. And in doing so, the Settlement avoids not only the risk of outright denial of Class member claims, but also the risk that, based upon Defendant's economic loss rule defense, even the damages that might have been awarded after successful litigation of this matter would not have included as much relief as is provided for by the Settlement.[65]

Accordingly, this *Reed* Factor also weighs heavily in favor of final approval of the Proposed Settlement.

<u>The Stage of the Proceedings and the Amount of Discovery Completed</u>

As part of their analysis, the Court also must evaluate the stage of the proceedings and the amount of discovery completed in order to satisfy the fifth *Reed* factor.[66] At bottom, that review comes down to "whether the parties have obtained sufficient information to evaluate the merits of the competing positions."[67] In particular, it is important for the parties to have "obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of the settling the cases on the terms proposed[.]"[68]

Here, the Settlement itself is the product of an informed process that left both parties more than adequately apprised of the merits of each side's case and the fairness of the settlement achieved. That is largely the result of both parties having the benefit of the long and complicated

---

[64] *See* Linkin Decl. at ¶22.
[65] *Id.* at ¶23.
[66] *Welsh*, 2018 WL 7283639, at 14 (internal citations and quotations omitted).
[67] *Id.*
[68] *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F.Supp.2d 612, 620 (E.D. La. 2006)

history of the NIBCO PEX litigation that preceded this matter by nearly a decade and the Matson Plaintiffs' individual litigation.[69]

As a result, the parties here had access to and reviewed discovery which fully informed both sides as to the relative strengths and weaknesses of each side's case. Plaintiffs had access to discovery produced in the *Cole* litigation, the benefit of the Matsons' prior state court litigation, the extensive public record form *Cole* (such as class certification briefing, summary judgment briefing, *Daubert* motions, expert reports, etc.), the investigation conducted in the *Garrett* litigation, including consultation with experts, as well as additional informal discovery produced by Defendant's for purposes of arm's length negotiations.[70] Likewise, Defendant had the benefit of the Matson Plaintiffs' depositions, the *Cole* discovery, and materials provided by Plaintiffs also as part of the negotiation process. In short, the parties were more than adequately informed when negotiating the Settlement.

Accordingly, this *Reed* Factor also weighs heavily in favor of final approval of the Settlement.

<u>The Opinion of Class Counsel, Class Representatives and Absent Class Members</u>

Finally, the sixth *Reed* Factor permits the Court, when considering the merits of a proposed settlement, to "rely upon the judgment of experienced counsel for the parties."[71] Moreover, "absent

---

[69] *See* Linkin Decl. at ¶24.
[70] *Id.* at ¶25.
[71] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

fraud, collusion, or the like" the court should be hesitant to "substitute its own judgment for that of counsel."[72]

Here, Plaintiffs' Counsel submit the Settlement is fair, reasonable, and adequate based upon the following factors:

- The experience litigating this matter, as well as understanding of the complexities involved in the nationwide NIBCO PEX litigation;

- Extensive experience in other class action matters, which spans decades;

- Knowledge of the information reviewed in this case;

- Participation in arms'-length adversarial negotiations which extended over nearly a year and culminated in a full-day mediation before a highly regarded and professional mediator with direct experience in defective piping matters (including serving as the mediator in *Cole*).[73]

In addition to the above, the Settlement is overwhelmingly supported by Class members. As of the date of this filing, only 30 Class members have opted-out of the Settlement, and a single objection has been filed. Moreover, both the objection (which is substantively addressed below) and all of the Class member opt-outs were submitted by *Williams*' Counsel—whose improper efforts to solicit opt-outs and objectors through unauthorized, misleading and coercive communications with absent class members were already the subject of an 18-page order issued by this Court.[74] As for Class Counsel's interactions with absent Class members, the reaction to the Settlement has been wildly enthusiastic. Each of the firms appointed Class Counsel have fielded numerous calls from various Class members, each of whom have voiced their support for the

---

[72] *Id.*

[73] *See* Linkin Decl. at ¶26.

[74] *See* Dkt. 106, voiding opt-out requests submitted by *Williams*' counsel and solicited through improper means.

Settlement and are pleased with: (i) the reimbursement levels; (ii) the provision of discounted plumbing services and no cost/low-cost financing to assist in class members with unreimbursed costs; and (iii) the prospect of receiving relief now.[75]

Accordingly, the Settlement overwhelmingly satisfies each of the *Reed* Factors and supports a finding by the Court that the Settlement is fair, reasonable, and adequate.

## VI.
### THE COURT SHOULD RETAIN JURISDICTION TO OVERSEE THE CLAIMS PROCESS

As explained in Plaintiffs' Motion for Preliminary Approval and the Notice, the claims process contemplated is more involved than often is the case because, *inter alia*, it contemplates additional rounds of distributions (an initial payment of 50% of damages to Settlement Class members with qualifying leaks and a subsequent payment to eligible Claimants of up to 75% of such damages depending on the volume of claims received), a Claim Period that remains open until May 16, 2025, and a fair and efficient Claims adjudication process. As such, and as set forth in the proposed Final Approval Order, the undersigned counsel request the Court retain jurisdiction over this matter, the Settlement, and the Settlement Process to entertain any appropriate motion practice as may be necessary in the routine effectuation of the Settlement.

## VII.
### REASONABLE SERVICES AWARDS ARE APPROPRIATE HERE FOR THE CLASS REPRESENTATIVES

Pursuant to the Settlement Agreement, Class Counsel is permitted to apply for reasonable service awards for each of the Class Representatives. Federal courts "have repeatedly approved incentive awards in class action lawsuits to compensate plaintiffs for the service they provide in the suit and the burdens they shouldered during the litigation."[76] Service awards "compensate named plaintiffs for the services they provide and the risks they incur initiating and prosecuting

---

[75] *See* Linkin Decl.at ¶27.
[76] *Welsh*, 2018 WL 7283639 at *15. *See also Dehoyos*, 240 F.R.D. at 339-40.

class action cases in their own name but on behalf of unnamed class."[77] Moreover, courts "have consistently found incentive awards are an efficient and productive way to encourage members of a class to become class representatives."[78]

Here the efforts of Plaintiffs David Matson, Barbara Matson, and Yolanda Garrett clearly inured to the benefit of the Class. Reasonable service awards would compensate each for their considerable time, effort, and risk they undertook in prosecuting this litigation.[79] Accordingly, Class Counsel submit that reasonable service awards are wholly appropriate under the circumstances presented and requests a service award in the amount of $20,000 split evenly between the Matsons and Yolanda Garrett, also to be separately paid by Defendant NIBCO, such that the fund and other members of the Class will not be taxed by this cost.[80]

## VIII.
## THE COURT SHOULD OVERRULE THE GARCIA OBJECTIONS

In response to the relief provided by the Settlement, a single Class member has objected to its approval. The objection is filed by Jose Garcia, who is represented by *Williams'* Counsel, and whose objection was presumably solicited through the same process that led to the voiding of more

---

[77] *Welsh*, 2018 WL 7283639, at *15(citing *Altier v. Worley Catastrophe Response, LLC*, 2012 WL 161824, *15 (E.D. La. Jan 18, 2012)).
[78] *Id.* (citing *Shaw v. Toshiba Am. Info Sys., Inc.*, 91 F.Supp.2d 942, 973 (E.D. Tex. 2000) (awarding incentive awards of $25,000 to each of two named plaintiffs); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 504 (N.D. Miss. 1996) (approving incentive awards of $10,000 to each of four name plaintiffs)).
[79] *See* Linkin Decl. at ¶¶28-29.
[80] *See* Linkin Decl. at ¶30.

than 400 opt-outs because of its improper nature. While the objections themselves suffer from a variety of procedural defects outlined below, Plaintiffs also address the lack of merit to each.

### A.  The Garcia Objections are Procedurally Improper

As an initial matter, Garcia's objections are procedurally improper for a variety of reasons.

First, prior to submitting his objection, Garcia *opted-out* of the proposed Settlement through *Williams'* counsel's March 16, 2021 submission to Angeion. Subsequently, on May 19, 2021, Garcia submitted an objection which attached a form clearly designed by *Williams'* counsel, and purporting to *conditionally* withdraw his opt-out for the purpose of filing his objection—*i.e.*, Garcia apparently wishes to have it both ways. And of course, overarching the procedural defects explained below is the fact Garcia's objection was likely produced by the same process which led to the voiding of over 400 opt-outs originally submitted through *Williams'* counsel.[81] For that reason alone, Plaintiffs submit the Court should view Garcia's objections with the same level of skepticism and disfavor which led to the Court entering its June 10th Order.[82]

As for the procedural defects themselves, Garcia's request to condition his objection on the premise he also be permitted to opt-out following final approval is legally improper. Moreover, under well-accepted law, Garcia does not have standing to raise his objection that Plaintiffs cannot

---

[81] The total number of opt-outs actually submitted either by or on a form used by *Williams'* counsel was 415. The number 411 originally calculated by the claim's administrator was a typographical error. Regardless, all of these 415 Class members received curative notice and were given the opportunity to reconsider their decision as to whether to participate, opt-out or object.
[82] *See* Dkt. 106 at pp. 7-16.

adequately represent all Class members. Thus, in addition to the lack of substance to Garcia's objections, they are improper and should not be considered by the Court.

    1.  <u>Garcia's Contingent Objection is Improper</u>

Rule 23(e) "does not expressly allow for contingent objections or contingent opt-outs."[83] That is because each action is a "mutually exclusive option[]: if one actually opts out, she has no standing to object to the settlement and she will not be bound by it."[84] To "allow the class member to have it both ways . . . would countenance the practice of influencing litigation—or attempting to do so—in which the class member really has no stake. That result is unacceptable."[85] Put simply "it is well established that 'class members may either object or opt out, but they cannot do both.'"[86]

Here, in light of the *Williams'* counsel's actions throughout the approval process, Garcia's decision to opt-out, only to opt back in through a conditional objection, is even more questionable and raises the specter of a lawyer-driven objection designed solely to achieve pecuniary gain on the part of the objector's counsel and to the detriment of the Settlement Class.[87]

    2.  <u>Garcia Does Not Have Standing to Raise Certain Objections</u>

Garcia also lacks standing to raise his objection that Plaintiffs do not adequately represent Class Members whose Covered Products have not leaked. Putting aside the lack of substance to

---

[83] *Olden v. LaFarge Corp.*, 472 F.Supp.2d 922, 930 (E.D Mich. 2007).

[84] *Id.* (citing *Becherer v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 193 F.3d 415, 426 (6th Cir. 1999)); 4 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTION §11:55, at 168 (4th ed. 2002).

[85] *LaFarge*, 472 F.Supp.2d at 931.

[86] *In re Nat'l League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 423 (E.D. Pa. 2015) (quoting NEWBERG ON CLASS ACTIONS, §13:23 (5th ed.)

[87] The Preliminary Approval Order entered by the Court contemplates the treatment of such contingent objections and directs that such objections will be treated as a request to opt-out only. *See* Dkt. No. 68 at p. 8 (¶IV(B)(5)) ("Any statement or submission purporting or appearing to be both an objection and opt out shall be treated as a Request for Exclusion."). Plaintiffs respectfully request the Court determine either that (i) Mr. Garcia's conditional objection is such a request for exclusion <u>only</u> or alternatively, that Mr. Garcia will be bound by the Settlement should this Court grant the Settlement final approval.

Garcia's argument, Garcia lacks standing to even assert this objection because Garcia also has suffered leaks from Covered Products.

Federal Courts (including the Fifth Circuit) have long held objectors to a class settlement lack standing to object to a proposed settlement or settlement process unless the objection they raise concerns an issue in which they have a justiciable interest.[88] Here, Garcia's own objection makes clear he has no such interest in any purported harm (there is none) caused by a conflict between Class members with present leak claims and those with potential future leak claims.[89] As such, Garcia simply cannot complain about a purported issue in a settlement in which he has no interest.

### B.  The Garcia Objection Lacks Merit

Putting aside the procedural and standing flaws outlined above, Garcia's objections also substantively lack merit. First, there is no intra-class conflict between Class members who have already suffered leaks and those who may suffer future leaks. That is because each Class member with a qualifying claim stands to receive the same type of relief—*i.e.*, reimbursement for past and future damages of up to 75% through an allocation regime that treats each such Class member

---

[88] *See In re Packaged Ice Antitrust Litig.*, 2018 WL 4520931, at *5 (6th Cir. May 24, 2018) ("An objector who does not have an injury-in-fact lacks standing to appeal an aspect of a class-action settlement that does not adversely affect his own interests"); *See also Huyer v. Van de Voorde*, 847 F.3d 983, 986-87 (8th Cir. 2017) (holding class member could not object on basis that group of class members to which she did not belong were not adequately represented because objectors failed to "demonstrate that she has suffered an injury in fact"); *Gokarke v. Federal Express Corp.*, 2013 WL 12094870, at *7 (W.D. Tenn. Nov. 11, 2013) (overruling multiple objections and noting that "none of the objectors has demonstrated the injury-in-fact or redressability required for standing to object"); *Blessing v. Sirius XM Radio, Inc.*, 507 Fed. Appx. 1, 5 (2d Cir. 2012) ("As objectors failed to state an injury-in-fact, we find that they lack standing to challenge the district court's . . . class certification order."); *Glasser v. Volkswagen of America, Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011) (noting in context of class counsel's fee that in order to object the class member "must be aggrieved"); *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 236-37, n.16 (5th Cir. 1982) (holding only class members whose counsel were "tainted by the specter of a conflict of interest" "may properly complain of [that] conflict of interest").

[89] *See* Dkt. 95-1.

equally. Second, the Settlement itself is far from meager. Indeed, on a per class member basis it far exceeds the *Cole* settlement, which has already been finally approved.

    1.  <u>There is No Intra-Class Conflict.</u>

Garcia first objects on the basis that Plaintiffs cannot adequately protect all Class members because Plaintiffs have suffered multiple leaks, while other Class members have yet to suffer any leaks at all. But he is simply wrong on the law.

Garcia relies heavily upon both *Amchem v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fireboard*, 527 U.S. 815 (1999), two opinions which arose out of the asbestos litigation crisis of the 1980s and 90s. But in relying on *Amchem*, *Ortiz* and some of their progeny, Garcia wrongly conflates the 23(a)(4) adequacy problem created by a flawed method of *allocation* that is not present here, with the simple existence of past and future claim holders in a single class which while admittedly present here, creates no such conflict under 23(a)(4). Neither *Amchem*, *Ortiz*, nor any of the cases cited by Garcia hold any differently.

In *Amchem*, the Supreme Court was faced with judging the appropriateness of a class settlement (which had been approved by the district court but disapproved on appeal to the Third Circuit) that provided for the immediate payment of delineated dollar amounts to class members already suffering from asbestos related injuries, while at the same time constraining payouts to class members who had previously been exposed to asbestos but had not yet suffered any known injury. In determining the settlement class could not be certified, the Court notably focused on two issues. First, the Court noted the injuries suffered by class members were varied and unpredictable given that the harm caused by asbestos exposure manifested itself in varied forms of illness, in turn requiring varied forms of treatment, and ultimately resulting in varied outcomes for class members—all of which made both adequacy and Rule 23(b)(3)'s predominance requirement

difficult.[90] Second, the Court focused on the method of *allocation* that was part of the *Amchem* settlement. That *allocation* method was fundamentally flawed because it did not take into account the varied ways in which class members suffered harm from asbestos exposure.

Here, the Settlement creates none of the issues implicated by the *allocation* method present in *Amchem*. That is because no differences exist in the injuries or harm suffered by Class members similar to those which made the *Amchem* settlement problematic. That is to say, Class members either have leaking Covered Products which have caused property damage, or they do not. The remedy for any such leaking Covered Product is the same for each Class member—money to repair and replace the Covered Products and resulting water damage at the same percentage reimbursement level.[91]

*Ortiz* lies even farther from the circumstances presented here. In *Ortiz,* the Court disfavored a mandatory 23(b)(1) settlement of asbestos claims, which provided no opportunity for class members to opt out, and which was the product of a process that included the complaint and motion for preliminary approval being filed *on the same day*. Moreover, the Court noted the *Ortiz* settlement suffered from the same fundamentally flawed method of *allocation* as in *Amchem*.[92]

Unlike in *Ortiz*, this Settlement is not a mandatory one. Class members unsatisfied with the results of the Settlement were free to opt-out and go their own way. Of course, out of a class

---

[90] *See Amchem*, 521 U.S. at 624-626 ("Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard.").

[91] The Court in *Amchem* was also concerned by notice which made the ability to opt-out of the *Amchem* settlement largely illusory. Here, the Class suffers from none of these issues. That is because Notice was sent to the exact address for each home containing Covered Products. And importantly, unlike the exposure only class members in *Amchem* who were potentially releasing future state law claims should they become sick, the Class members here face expiring statutes of limitation, such that absent a remedy now, there will be no future remedy for them.

[92] *See Ortiz*, 527 U.S. at 825, 864.

of approximately 8,100 homes, with the notable exception of those thirty absent class members likely swayed by *Williams'* counsel's unauthorized communications, almost none have done so.

And none of the other cases cited by Garcia offer support for his meritless argument that an intra-class conflict exists rendering Plaintiffs inadequate representatives. Each case cited is either concerned with issues related to (i) a flawed method of *allocation*; or (ii) some other fundamental form of intra-class conflict which does not affect *this* Settlement. Indeed, one of the opinions pointed to by Garcia specifically supports this Court's approval of the Settlement.

In *Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019) the Fourth Circuit reversed approval of a settlement for two reasons: (i) the improper actions of class counsel toward counsel and putative class members in an earlier filed competing class action (ironically, like the *Williams'* counsel has engaged in here, through their improper actions aimed at the earlier-filed *Matson* case) rendered settlement class counsel inadequate under 23(a)(4); and (ii) a defective method of *allocation* through which some members of a single class would be taking from a distinct pool of money (a reserve fund) to which other class members had a differing and competing basis for entitlement.[93] Here, all Settlement Class members are paid in the same manner from the same pool of funds and have no such competing interest.

In *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, the Second Circuit was concerned with unitary representation between *both* a 23(b)(2) class and a 23(b)(3) class, whose interests and relief were far different and in fact outright antagonistic to one another.[94]

---

[93] *Sharp Farms v. Speaks*, 917 F.3d 276, 295-298 (4th Cir. 2019).
[94] *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016).

Here, there is no need for injunctive relief—class members are eligible for the same form of relief for the same form of damages.

*Dewey v. Volkswagen Aktiengesellschaft* concerns reversal of final approval of a class settlement involving defective leaking auto sunroofs—but also specifically approves of settlements structured in the manner Plaintiffs have structured this Settlement.

In *Dewey*, the settlement contained a flawed method of *allocation* which prioritized some class members over others. Specifically, the settlement provided immediate payment to members with prior leaks, while only permitting lesser, *pro rata* residual payments to class members who might suffer from future leaks. In disapproving the certification of the settlement class, the Third Circuit hypothesized that a settlement which would have made immediate payments to class members with past and present leaks, and then the same payments to class members who suffered future leaks would not have created an *Amchem* problem.[95] Indeed the Third Circuit specifically held that having class members with past damages and class members with future damages in a single settlement class did not render the class representatives who had already suffered such leaks inadequate.[96] The Settlement here does not suffer from a flawed method of *allocation* and contains structural protections for Class members, such as: (i) uniform reimbursement levels dictated by uniform parameters (including those to qualify for a re-plumb); and (ii) a floor and ceiling for reimbursement levels which ensures the Settlement Fund is large enough to payout all claims at the 50% reimbursement rate, while also making it likely the payout will be enhanced for Settlement Class members if the claims experience dictates. Simply put, each Settlement Class member with

---

[95] *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 188 (3d Cir. 2012).
[96] *Id.*

a qualifying leak gets paid the same amount from the same funds, regardless of whether those leaks occurred yesterday, today, or tomorrow.[97]

Thus, Garcia's concern regarding a purported fundamental conflict among Class members is simply not present here. Each Class member's interests are completely aligned with the Plaintiffs, and the Settlement itself allocates its benefits to each in exactly the same manner.[98]

### 2. The Settlement Fund is anything but Meager

Garcia's second objection amounts to little more than Monday morning quarterbacking that "the settlement is not enough." But such an objection has no merit.[99]

Garcia argues the Settlement is "underfunded" because it fails to cover anywhere near the proven *full amount* of past and future damages to homeowner's residences. Putting aside the fact that the Settlement actually pays between 50% and 75% of damages—a remarkable result for Class members— Garcia's contention is not the standard by which class settlements are ever judged.

---

[97] The other three cases cited by Garcia for support are equally unavailing. *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) an earlier Second Circuit case was concerned with the intra-class conflict that occured when three different types of class members could only receive compensation in one of three different manners (again, an allocation issue). That is certainly different from here, where each Class member with a qualifying clam is paid in precisely the same manner—50-75% of that claim from the fund. And *Raymond v. Talisman Energy, USA, Inc.*, 2019 WL 2863926 (S.D. Tex. July2, 2019) and *Torres v. American Airlines, Inc.*, 2020 WL 3485580 (N.D. Tex. May 5, 2020) did not even concern the settlement of class actions, but rather are in the context of a contested class certification motion, and thus are entirely irrelevant here.

[98] Garcia also complains Plaintiffs are inadequate representatives because he claims under the Settlement, NIBCO' s Limited Warranty would "effectively be shortened to May 2025." Dkt. No. 95 at 21. Simply wrong. The Settlement Agreement specifically preserves NIBCO's Limited Warranty for any remaining period. *See* Settlement Agreement, Dkt. No 50-1, at ¶18.

[99] *Dehoyos*, 240 F.R.D. at 309 ("[A] settlement is not a "wish-list of class members that the Defendants must fulfill."); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002) ("To the extent that objectors argue the settlement is not high enough . . . these objections [are] without merit. The test is whether the settlement is adequate and reasonable, not whether a better settlement is conceivable.");*see also In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *2 (D.D.C., Mar. 31, 2000); *Berry v. Wells Fargo & Co.*, 2020 WL 9311859, at *8 (D.S.C. Jul. 29, 2020); *In re Mi Windows and Doors, Inc. Prod. Liability Litig.*, 2015 WL 12850547, at *12 (D.S.C. Jul. 22, 2015); *In re Polyurethane Foam Antitrust Litig.*, 168 F.Supp.3d 985, 1001 (N.D. Ohio 2016) ("The objectors armchair-quarterbacking and wishing-for-more does not provide valid grounds to disapprove the settlement.").

Indeed, "compromise is the essence of a settlement, and the settlement need not accord the plaintiff class every benefit that might have been gained after full trial."[100] Self-evidently, the compromise reached reflects the inherent risks in litigation compared against a reasonable range of recovery. Moreover, it compares more than favorably (and in fact exceeds) the closest comparable benchmark available—*i.e.*, the *Cole* settlement. That is to say, class members and the Court do not have to guess as to what a reasonable recovery would be on these facts, because the judicially approved *Cole* settlement guides that conclusion. Judged against that guide, the Settlement is an empirically excellent result.

Garcia also complains that recovery under the Settlement is too small because Plaintiffs overstate the strength of NIBCO's defenses.[101] Essentially, Garcia's claim is because *Williams'* counsel was able to overcome a 12(b)(6) motion to dismiss, that success here through class certification and trial was preordained for the class. Of course Garcia fails to consider (i) the success he touts was only at the pleading stage;[102] (ii) an equal or larger number of opinions arising out of state and federal court actions related to the Covered Products have dismissed some or all of these same claims;[103] and (iii) that even giving the claims brought here every legal advantage,

---

[100] *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 n.69 (5th Cir. 1978).

[101] *See* Dkt. No. 95 at p. 24.

[102] *Williams v. NIBCO*, 2021 WL 1069044, at *13 (W.D. Tex. March 18, 2021) ("At this stage of the litigation, the court is only determining whether Plaintiff has made factual allegations sufficient to state a plausible claim. . . . The Court is not deciding that Plaintiff will ultimately succeed on any claim.") (quoting *Gehan Homes, Ltd. v. NIBCO Inc.*, 2020 WL 5110707, at *13 (W.D. Tex. Aug. 31, 2020)).

[103] *See, e.g.*, *Meadow v. NIBCO, Inc.*, 2016 WL 2986350 (D.Tenn. May 24, 2016) (dismissing express warranty claims under Alabama law; denying claims where no leak had occurred; and applying economic loss rule to bar claims for repair and replacement); *Cole v. NIBCO Inc.*, 2016 WL 10536025 (D.N.J. Feb. 26, 2016 (dismissing strict liability and negligence claims under Texas and Alabama law); *Cole v. NIBCO Inc.*, 2015 WL 2414740 (D.N.J. May 20, 2015)(dismissing Texas express warranty claims).

the time and expense to trial would have been exceptionally long and arduous and made recovery for the Class a distant goal.[104]

Finally, Garcia complains the settlement fund itself is too small to cover Class member Claims. In doing so, Garcia makes the unsupported leap that each Class member will have a Claim. But there is no support for that contention. Indeed, the Claims submitted to date make clear that only a small dollar number of unreimbursed claims have been made thus far, and it is unlikely that the claims volume will increase as the time elapsed from the installation of the products gets longer.[105] Moreover, the claims history in *Cole* also supports this contention.[106] The settlement fund is more than ample to support the claims of Class members.

## IX.
### CONCLUSION

The proposed Settlement with NIBCO that has created a Settlement Fund of $7.65 million represents an outstanding result for the Class. Adequate notice was provided to the Class; the Settlement is fair, adequate, reasonable, and not the product of collusion; and certification of the

---

[104] For example, *In re Polybutelene Plumbing*, which *Williams* counsel has referenced multiple times during these proceedings, took nine (9) years and untold fees and expenses just to reach settlement. Trading the terms and certainty of this Settlement for the "opportunity" to litigate for another decade with the risk of receiving nothing at the of the journey is a choice Garcia made for himself by opting-out, but it is not a decision this Court should make for the Settlement Class members, the overwhelming majority of whom have voted their approval of the Settlement.

[105] *See* Weisbrodt Decl. at ¶¶22-28. Garcia's claims regarding the fund also presupposes that every structure included in the Class will need to be replumbed. But that supposition does not take into account that a large number of structures which have leaked in Texas and Alabama have already been replumbed, or otherwise repaired by either the homebuilder or its plumbing contractor as part of its warranty service or paid for by a homeowner insurance policy. Of course, Class members who have had past repairs or replumbs handled in this manner are still eligible to be compensated for their unreimbursed expenses.

[106] *See* Defendant's Cross Motion in Support of Final Approval at 38.

Class is warranted under the requirements of Rule 23. As such, Plaintiffs' Motion for Final Approval of the Class Action Settlement should be granted.[107]

**WHEREFORE**, Plaintiffs respectfully request that Court enter (i) an Order granting Plaintiffs' Motion for Final Approval of Class Action Settlement; (2) an Order granting Class Counsel's Application for Service Awards; and (3) an Order granting Plaintiffs' separately filed Motion for Approval of Class Counsels' Attorneys' Fees and Costs—and awarding all such other relief the Court deems fair and appropriate under the circumstances.

Dated: August 30, 2021                         Respectfully submitted,

                                                  /s/ Robert E. Linkin
                                                Robert E. Linkin

                                                **NIX PATTERSON, LLP**
                                                3600 N Capital of Texas Highway, Ste. B350
                                                Austin, Texas 78746
                                                (512) 328-5333 (telephone)
                                                Austin Tighe
                                                atighe@nixlaw.com

                                                **MUNCK WILSON MANDALA, LLP**
                                                807 Las Cimas Pkwy., Building II
                                                Suite 300
                                                (737) 201-1616 (telephone)
                                                Robert E. Linkin
                                                rlinkin@munckwilson.com
                                                **DuBOIS, BRYANT & CAMPBELL, LLP**
                                                303 Colorado Street, Ste. 2300
                                                Austin, TX 78701
                                                (512) 457-8000 (telephone)
                                                J. David Rowe
                                                drowe@dbcllp.com

---

[107] Plaintiffs submit their previously filed Motion for Approval of Class Counsels' Fees and Costs (Dkt. 78) should be contemporaneously granted with the instant motion for final approval.

**GRABLE GRIMSHAW PLLC**
1603 Babcock Road, Ste. 118
San Antonio, TX  78229
(210) 963-5297 (telephone)
Brandon J. Grable
brandon@g2.law
Matthew Grimshaw
matt@g2.law

*ATTORNEYS FOR PLAINTIFFS*

**David Matson and Barbara Matson, Individually, and on Behalf of All Others Similarly Situated**

*/s/ Kirby D. Farris*

Kirby D. Farris
*(Pro Hac Vice* Forthcoming)
**FARRIS, RILEY & PITT LLP**
505 20th Street North, Ste. 1700
Birmingham, AL 35203
(205) 324-1212 (telephone)
(205) 324-1255 (fax)
kfarris@frplegal.com

*ATTORNEY FOR PLAINTIFFS*

**Yolanda Garrett, Individually, and on Behalf of All Others Similarly Situated**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Missy Atwood
matwood@germer-austin.com
Ben Zinnecker
bzinnecker@germer-austin.com
GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, TX 78701

J. Gordon Cooney, Jr.
Gordon.cooney@morganlewis.com
Franco A. Corrado
Franco.corrado@morganlewis.com
MORGAN, LEWIS & BOKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921

Kevin Kuhlman
kkuhlman@lathropgage.com
LATHROP & GAGE, LLP
2345 Grand Blvd., Ste. 220 Kansas City, MO
64108-2618

*Counsel for Defendant NIBCO, Inc.*

George M. Fleming
George-fleming@fleming-law.com
Gregory D. Brown
Gregory_brown@fleming-law.com
FLEMING, NOLEN & JEZ, LLP
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056

*Counsel for Non-Party Williams Plaintiffs*

_/s/ Robert E. Linkin_____
Robert E. Linkin