IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID MATSON, BARBARA MATSON, YOLANDA GARRET, INDIVIDUALLY AND ON BEHLF OF ALL OTHERS SIMILARLY SITUATED, | § § § § § | 5-19-CV-00717-RBF |
| *Plaintiffs,* | § § | |
| vs. | § § | |
| NIBCO INC., | § § | |
| *Defendant.* | § § | |

**FINAL SETTLEMENT APPROVAL ORDER**

Before the Court are the following: (1) the Motion for Settlement Approval filed by Plaintiffs Yolanda Garret, Barbara Matson, and David Matson, Dkt. No. 121; (2) the Cross-Motion for Final Approval of Class Action Settlement filed by Defendant NIBCO, Inc., Dkt. No. 122; (3) the Objections to the Proposed Class Action Settlement filed by Jose Garcia, Dkt. No. 95; and (4) Defendant NIBCO's Objections to Certain Exhibits and Witnesses Offered by Garcia, Dkt. No. 126. All parties to this litigation have consented to U.S. Magistrate Judge jurisdiction, and the case has accordingly been reassigned. *See* 28 U.S.C. § 636(c). On September 9, 2021, the Court held a final approval hearing in this case at which Plaintiffs, NIBCO, and Garcia appeared through counsel of record.

After considering the parties' December 22, 2020, proposed Settlement Agreement, *see* Dkt. No. 50-1, the arguments made at the September 9 hearing as well as in the briefing submitted prior to the hearing, and Garcia's objections, the Court hereby enters this Final Settlement Approval Order[1] that: (1) **GRANTS** the Motions for Final Approval, Dkt. No. 121

---

[1] This Final Settlement Approval Order incorporates the Settlement Agreement and its

& 122; (2) finally certifies the provisionally certified settlement class; (3) finally approves the Settlement Agreement dated December 22, 2020; and (4) overrules Garcia's objections, Dkt. No. 95. The matter of attorneys' fees will be addressed by separate order.

The Court will retain jurisdiction over this action, as well as all parties and Settlement Class Members, for all matters relating to this litigation and the settlement of it, including, without limitation, the administration, interpretation, effectuation, or enforcement of the Settlement Agreement, this Final Approval Order, and the soon-to-be-entered Final Judgment.

### Factual and Procedural Background

On June 19, 2019, Plaintiffs David and Barbara Matson initiated this action on behalf of themselves and others similarly situated, alleging that Defendant NIBCO manufactured or distributed defective cross-linked polyethylene tubing ("PEX tubing") that caused or will cause them and the putative class members to suffer water damage to their residences. Their live Complaint raises claims for (1) breach of express warranty pursuant to § 2-313 of the Uniform Commercial Code, (2) breach of implied warranty of merchantability pursuant to § 2-314 of the Uniform Commercial Code, and (3) Strict Liability Design Defect, Manufacturing Defect, and Failure to Warn. *See* Dkt. No. 52.

NIBCO's PEX tubing has been the subject of extensive litigation since at least 2013, beginning with the class action styled *Cole v. NIBCO*, No. 13-cv-7871-FLW-TJB (D.N.J. filed Dec. 27, 2013), which resulted in a final court-approved settlement on April 11, 2019.  Plaintiffs

---

Exhibits and the Preliminary Approval Order and its Exhibits. *See* Dkt. Nos. 50-1 & 68. Unless otherwise expressly provided herein, the terms defined in the Settlement Agreement and Preliminary Approval Order shall have the same meanings for purposes of this Final Approval Order and the accompanying Final Judgment. To the extent that the terms of this Final Approval Order expressly conflict with any provision of the Settlement Agreement and its Exhibits and the Preliminary Approval Order and its Exhibits, the terms of this Final Approval Order shall control.

and other Alabama and Texas homeowners, however, ultimately were excluded from the *Cole* class, prompting Plaintiffs to pursue their claims separately. Plaintiffs did so first by filing an individual petition in state court against builder DR Horton and later adding NIBCO as a Defendant. Ultimately, after engaging discovery with respect to their individual claims, Plaintiffs chose to seek relief on a class-wide basis and filed this action, while simultaneously nonsuiting their state court action.

NIBCO, for its part, denies that it is liable to Plaintiffs and the Class, and instead asserts that any failures related to the PEX tubing resulted from the actions of others, including but not limited to installation errors.  To that end, NIBCO moved to dismiss Plaintiffs' claims under Rule 12(b)(6), raising various defenses including that (1) Plaintiffs failed to plausibly plead an express-warranty claim; (2) Plaintiffs' implied-warranty claim was time barred; and (3) Plaintiffs' strict-liability claims were barred by the statute of limitations and the economic-loss doctrine. *See* Dkt. No. 14.

On December 22, 2020—a year and a half after Plaintiffs first instituted this action and while NIBCO's motion to dismiss was pending—Plaintiffs advised the Court that they successfully resolved their claims with NIBCO. *See* Dkt. No. 50.[2] The Court granted Plaintiffs' Motion for Preliminary Approval on February 23, 2021. *See* Dkt. No. 68. In that Order, the Court (1) provisionally certified a settlement class, (2) preliminarily approved the terms of the settlement, (3) directed notice be transmitted to the class members in the form (as amended) proposed by the *Matson* Plaintiffs, (4) appointed class counsel to represent the class members, (5) directed the manner and timetable for the filing of requests for exclusions, objections, and any evidentiary support, and (6) scheduled a final approval hearing for June 15, 2021. *See id.*

---

[2] The Settlement also resolves the related putative class action filed by Yolanda Garret in the case styled *Garret v. NIBCO Inc.*, No. 19:cv-01137-RDP (D. Ala. filed Jul. 18, 2019).

Plaintiffs transmitted notice to the class via its settlement administrator on March 25, 2021. But matters didn't proceed as planned. Before Court-approved notice could issue, attorney George Fleming of the law firm Fleming, Nolen & Jez, LLP—who represents objector Garcia and plaintiffs in a later-filed, competing putative class action styled *Williams v. NIBCO*, No. 5-20-cv-48-JKP-RBF (W.D. Tex. filed Jan. 14, 2020)—sent two inherently misleading, inherently coercive, and factually inaccurate letters to the putative class members encouraging them to opt-out. These letters left the Court no choice but to (1) restore to the class the class members whose opt-outs were submitted directly by Mr. Fleming and his law firm or using the firm's form;[3] (2) order that a curative notice be sent to them; (3) re-open the opt-out period as to the affected class members; and (4) re-set the final fairness hearing for September 9, 2021. *See* Dkt. Nos. 106 &117. To date, only 30 class members out of more than 8,000 have chosen to opt-out of the settlement class. *See* Dkt. No. 121 at 4.[4]

On May 10, 2021, class member Garcia—who claims to have suffered several leaks from NIBCO's PEX tubing—filed objections to the Settlement. *See* Dkt. No. 95. According to Garcia, the Settlement shouldn't be adopted because: (1) Plaintiffs are inadequate representatives for the portion of the settlement class whose homes have yet to experience leaks; and (2) the settlement fund is "grossly inadequate." *Id.* Garcia included various items of evidence to support these objections. *See id.*

---

[3] Although the Order only struck 411 opt-outs, later-discovered evidence revealed that a total of 415 opt-outs were submitted in this manner. *See* Dkt. No. 121 n. 81. Accordingly, the same rationale for striking these four additional opt-outs applied with equal force. Moreover, because all 415 putative class members received curative notice and were given the opportunity to reconsider their decision as to whether to participate, opt-out or object, *see id.*, no prejudice would've resulted from this administrative discrepancy.

[4] All 30 opt-outs were submitted by Mr. Fleming.

On August 20, 2021, Plaintiffs and NIBCO formally moved for final settlement approval. *See* Dkt. Nos. 121 & 122. In arguing in favor of final approval, the parties contend that Garcia's objections lack merit and are also procedurally improper because: (1) Garcia conditions his objection on the premise that he also be permitted to opt-out following final approval and Rule 23(e) doesn't allow for contingent objections or contingent opt-outs; and (2) Garcia lacks standing to lodge his first objection because he has suffered leaks from NIBCO's PEX tubing. *See id.*

On September 7, 2021, two days before the scheduled final fairness hearing, Garcia filed—without leave of Court and in contravention of the timetable set forth in the Preliminary Approval Order[5]—a list of exhibits and witnesses he intended to call for the September 9 hearing. *See* Dkt. No. 124. The next day, NIBCO objected to the Court's consideration of 24 documents that Garcia didn't include with his May 10 objections and also to the testimony of one witness Garcia had never before disclosed. *See* Dkt. No. 126.

On September 9, 2021, the Court held a final fairness hearing at which the parties presented thoughtful arguments and evidence in support of the Settlement. The Court also provided Garcia an opportunity to lodge his objections[6] at the hearing and present his timely

---

[5] *See* Dkt. No. 68 at 8 (providing that any objection must be postmarked 75 days after the preliminary approval date and contain "a detailed written statement of the objection(s) and the aspect(s) of the Settlement being challenged, as well as the specific reasons, if any, for each such objection, *including any evidence* and legal authority that the Settlement Class Member or other individual with standing wishes to bring to the Court's attention") (emphasis in original). Garcia would've directly received notice of this objection process, and his attorney would've as well by virtue of previous filings Mr. Fleming has made in this case.

[6] Prior to objecting, Garcia unambiguously withdrew his prior opt-out. *See* Dkt. No. 95-1 at 2 (providing in relevant part "I wish to withdraw my Opt-out and be part of the Alabama-Texas PEX Settlement."). He was also one of the class members the Court restored to the Settlement Class. Nevertheless, the Court advised Garcia at the September 9 hearing of its intent to deny his alternative request to opt-out at a later date, should the Settlement be approved. *See, e.g.*, *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007) (denying class members requests

filed evidence. The Court, however, sustained NIBCO's objections to Garcia's untimely evidence but allowed Garcia to proceed by way of an offer of proof.[7] At the conclusion of the hearing, the Court took the matter of final approval and attorneys' fees under advisement.

## Analysis

For the reasons discussed below, the Court finds that Plaintiffs have met their burden with respect to final certification of the class under Rule 23(a) and (b)(3) and, specifically, that Plaintiffs and Class Counsel adequately represent the interests of the class. The Court also finds that the dissemination of the notice was the best notice practicable in accordance with Rule 23(c)(2)(B) and that it met the requirements of Due Process. Finally, the Class Settlement is fair, adequate, and reasonable, and therefore is approved in full as discussed further herein.

### I.     Certification of the Settlement Class Is Warranted.

In the Preliminary Approval Order, the Court provisionally certified the following Settlement Class:

> All Persons that own or have owned at any time since January 1, 2005, a residential structure constructed by: (a) D.R. Horton, Inc.-Birmingham (including, but not limited to, those for which the plumbing contracting was performed by or on behalf of Dupree Plumbing Co. Inc.) and which is located in the following cities in Alabama: Bella Vista; Bessemer; Birmingham; Calera; Chelsea; Cottondale; Hoover; Kimberly; Leeds; Maylene; McCalla; Montgomery; Northport; Odenville; Pinson; Pratville; Springville; Trussville; and Tuscaloosa; and/or (b) Continental Homes of Texas, L.P. (including, but not limited to, those for which the plumbing contracting was performed by or on behalf of Christianson Air Conditioning and Plumbing, LLC) and which is located in the following cities in Texas: Boerne; Cibolo; Converse; Live Oak; Medina County; New Braunfels; Royse City; San Antonio; San Marcos;

---

for conditional opt-outs and considering the objections). And, in the interest of justice, the Court permitted Garcia an opportunity to withdraw his objection and opt-out instead. Garcia declined to opt-out and instead chose to proceed with his objection. Accordingly, Garcia will be bound by this settlement.

[7] Although the Court permitted counsel for Garcia to proffer the aforementioned untimely filed evidence, it has not been considered in evaluating whether the Settlement should be finally approved.

Schertz; Seguin; and Universal City, that contains or contained NIBCO's Tubing, Fittings, and Clamps, including with respect to both (a) and/or (b), their spouses, joint owners, heirs, executors, administrators, mortgagees, tenants, creditors, lenders, predecessors, successors, trusts and trustees, and assigns ("Occupant Persons"); as well as all Persons who have standing and are entitled to assert a claim on behalf of any such Occupant Persons, such as but not limited to a contractor, distributor, seller, subrogated insurance carrier, or other Person who has claims for contribution, indemnity or otherwise against NIBCO based on claims for Qualifying Leaks of the Tubing, Fittings, or Clamps with respect to such residential structures. The Settlement Class includes all Persons who subsequently purchase or otherwise obtain an interest in a property covered by this Settlement without the need of a formal assignment by contract or court order.

A list of the residential structures in Alabama and Texas included in the Settlement Class has been provided to the Settlement Administrator and made available on the Settlement Website.

Excluded from the Settlement Class are D.R. Horton, Inc.-Birmingham, Dupree Plumbing Co. Inc., Continental Homes of Texas, L.P., and Christianson Air Conditioning and Plumbing, LLC (collectively "Specific Contractors").[8]

Also excluded from the Settlement Class is any Person (other than the named Plaintiffs in the Litigation) who, as of October 22, 2020, had pending litigation in any court or tribunal against NIBCO asserting claims based on a Covered Product.

Also excluded from the Settlement Class are: (i) NIBCO, its officers, directors, affiliates, legal representatives, employees, successors, and assigns, and entities in which NIBCO has a controlling interest; (ii) judges presiding over the Litigation; and (iii) local, municipal, state, and federal governmental entities.

Certification of the Settlement Class is hereby reaffirmed as a final Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3) for the same reasons as set forth in the Court's Preliminary Approval Order and discussed further herein.

---

[8] This exclusion applies regardless of the nature of such claims and specifically including their direct claims, their contribution and/or indemnity claims, and all claims arising from equitable subrogation/assignments from Persons who otherwise are or would be a part of the Settlement Class. With respect to claims arising through equitable subrogation or assignments, nothing in this paragraph shall enlarge the rights through equitable subrogation or assignment of the Specific Contractors beyond the rights of the assignor(s) or subrogor(s) at the time of the assignment or event of subrogation.

### A.     Rule 23(a) Is Satisfied.

*First*, the proposed class encompasses at least 8,000 homeowners in Texas and Alabama who owned structures that included NIBCO's PEX tubing. The numerosity requirement is therefore satisfied.

*Second*, the common contention in this case is whether NIBCO's PEX tubing is defective. That contention turns on a common answer about the design and/or manufacture of the product that is either true or false for each and every member of the Class. In other words, the validity of Class member claims can be determined in "one stroke."[9] Other common questions subject to a common answer include whether NIBCO knew of the alleged defects and whether NIBCO breached its Limited Warranty. Accordingly, the commonality test is also met here.

*Third*, the legal theories underlying the Plaintiffs' claims are the same as the theories that underly the claims of the Class—*i.e.*, Plaintiffs' contention that they were damaged by defectively designed and/or manufactured NIBCO PEX tubing. In other words, "[i]n the event the class members in this case were to proceed in a parallel action, they would advance legal and remedial theories similar, if not identical, to those advanced by the named plaintiffs." *Lightbourn v. County of El Paso*, Tex., 118 F.3d 421, 426 (5th Cir. 1997). Accordingly, Plaintiffs satisfy the typicality requirement.

*Fourth*, the Court finds that Plaintiffs and their counsel "will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement mandates an inquiry into (1) "the zeal and competence of the representatives' counsel" and (2) "the willingness and ability of the representatives to take an active role in and control the litigation

---

[9] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (In order to satisfy Rule 23(a)'s commonality requirement, the common contention "must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke.")

and to protect the interests of absentees" *i.e.*, no conflicts of interest exist between the named plaintiffs and the class they seek to represent. *Berger v. Compaq Computer Corp*., 257 F.3d 475, 479 (5th Cir. 2001) (brackets omitted). The Court finds that both requirements are met here.

Class Counsel collectively have decades of experience in prosecuting large class actions and have successfully represented individuals and classes in numerous complex matters. *See* Linkin Decls. (Dkt. No. 121-3. ¶¶ 7-8 & Dkt. No. 78, Ex. A ¶ 11). The Court has also personally observed Class Counsel's zealous advocacy and high-level of competence both in written briefing and at hearings in this case. With respect to the adequacy of the class representatives, as mentioned, the named Plaintiffs' legal and remedial theories are substantially similar to those of other members of the Class, and they are further "united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re Corrugated Container Antitrust Litig*., 643 F.2d 195, 208 (5th Cir. 1981). Finally, Class Counsel asserts—and the Court has no reason to believe otherwise—that Plaintiffs are well-informed and have participated heavily in the litigation by directing the efforts of Class Counsel.

Garcia's objections to the adequacy of the class representatives are overruled. To start, Garcia—who claims to have sustained approximately 20 leaks in his home—doesn't have standing to complain about the adequacy of representation for class members who haven't experienced a leak.[10] Regardless, there's no merit to Garcia's objections. Rule 23(a)(4) requires

---

[10] *See, e.g*., *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 236-37 n.16 (5th Cir. 1982) (noting that only class members whose counsel were "tainted by the specter of a conflict of interest" "may properly complain of [that] conflict of interest"); *In re Packaged Ice Antitrust Litig*., No. 17-2137, 2018 WL 4520931, at *5 (6th Cir. May 24, 2018) ("An objector who does not have an injury-in-fact lacks standing to appeal an aspect of a class-action settlement that does not adversely affect his own interests."); *Huyer v. Van de Voorde*, 847 F.3d 983, 986-87 (8th Cir. 2017) (objector lacked standing to object to the representation and compensation of class members whose properties were sold at foreclosure because her home had not been sold and, therefore, she wouldn't benefit from the changes to the settlement she sought).

that "[t]he class representatives' interests must be aligned with, and not antagonistic to, unnamed class members." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502 (S.D. Tex. 2004) (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999)). Such is the case here. There is no antagonism between interests here, and the Settlement's structure ensures that the interests of the class representatives and the class members are in fact aligned.

Garcia is unconvincing when contending that a conflict *necessarily* exists here under *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and its progeny because claimants with present injuries seek to represent future claimants. "There is no per se prohibition against certifying a single class including both presently injured and future claimants." 1 Joseph McLaughlin, McLaughlin on Class Actions: Law and Practice § 4:4 (17th ed. 2020). The Third Circuit explained, in a case resolving class claims based on allegedly defective automobile sunroofs, that *Amchem* is concerned with misalignment of interests, not situations, like the one presented here, where interests are in fact aligned:

> The problem with the representative plaintiffs in *Amchem* was that they 'would care little' for benefits that would have been valuable to other members of the class. This is because once a class member manifested symptoms of asbestos-related injuries, that class member would be solely concerned with obtaining a 'generous immediate payment' for the injury, not securing an 'ample, inflation-protected fund for the future.' *Amchem*, 521 U.S. at 626, 117 S. Ct. 2231. This resulted in a misalignment of interests—certain members of the class had an incentive to pursue protections for future claims, while the representative plaintiffs lacked any such an incentive.

> Here, on the other hand, the alignment of interests is not so starkly problematic. A class member who has already suffered leakage, and is thus a 'past' claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims. As such, past claimants also have an incentive to protect the ability of class members to make claims for future damage.

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012) (brackets omitted).[11] The same is true here. The class representatives still have NIBCO's PEX tubing installed in their homes and will continue to do so unless or until they receive a re-plumb, which will only occur if they suffer at least three qualifying leaks. They thus share an interest in preserving the ability to file claims based on future leaks. Moreover, the injuries suffered here are largely the same. Class members either have (or will have) leaking Covered Products or they do not. And the remedy for any such leaking Covered Product is the same for each Class member—money to repair and replace the Covered Product and resulting water damage at the same percentage reimbursement level. In contrast, the injuries suffered by class members in *Amchem* were varied and unpredictable given that the harm caused by asbestos exposure manifested itself in varied forms of illness. That concern, however, isn't present here.

Regardless, the Settlement here provides significant "structural protections" such that any intra-class conflict—assuming for argument's sake it existed—wouldn't prevent certification. *See Dewey*, 681 F.3d at 185. Specifically, both past and future Claims are compensated at the same amount under the same conditions, and the parameters for obtaining a re-plumb are the same for all class members, regardless of whether they currently are eligible for a remedy now or

---

[11] Although *Dewey* held that the class members with past damages could adequately represent those with future damage interests, an adequacy problem nevertheless existed because the settlement segregated class members into "reimbursement" and "residual" subsets, with claims in the residual subset only being paid after reimbursement claims through whatever amounts (if any) remained in the settlement fund. *Dewey*, 681 F.3d at 185 n.14, 187-88. Granting clear priority to the "reimbursement" subset created a misalignment of interests. *Id.* at 188. No such problem exists here. The settlement pays all class members the same percentage recovery with no priority to past leaks versus future leaks. Moreover, the Court in *Dewey* instructed that this problem was curable on remand without the need for sub-classing or different class representatives if the parties abandoned "the distinction between the reimbursement group and the residual group" and allowed "all members of the class to submit reimbursements with no difference in priority." *Id.* at 189. The parties did this, and the district court approved the settlement. *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 383 (D.N.J. 2012), *aff'd sub nom. Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191 (3d Cir. 2014).

do not become eligible until some later date. In other words, the Settlement doesn't provide to one set of class members greater remedies than others. Moreover, the settlement's payment structure—providing for a minimum of 50% of eligible losses and a maximum of 75%, depending on Claim volume—protects the sufficiency of the Settlement Fund for all class members if Claims are robust while also maximizing the likelihood of an enhanced payout if Claims are more modest. Accordingly, the misalignment concerns present in *Amchem* are absent here. And, contrary to Garcia's contentions, subclasses aren't mandatory under these circumstances. Rather, subclasses are just *one example* of structural protections capable of ensuring adequate representation in the face of intra-class conflicts. *See Juris v. Inamed Corp*., 685 F.3d 1294, 1323 n. 25 (11th Cir. 2012); *see also* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 7:31 (5th ed. 2021) (noting that subclassing is "not required as a matter of course" and is appropriate "only when the court believes it will materially improve the litigation").[12]

Nor is the Court persuaded by Garcia's argument that the class representatives haven't adequately represented future claimants here because they negotiated a claims date ending in May 2025, which according to Garcia, will leave "numerous" homeowners uncompensated. To start, common sense dictates that the Settlement must provide for a claims-submission end date. Moreover, the evidence suggests that a May 2025 claims closing date appears more than fair, given that either all or at least a majority of the homes at issue were built between 2008 and 2012. Accordingly, a claim period closing in May 2025 would permit class members 13 to 17 years from construction to discover if a leak has or will develop. Such a closing date is also in

---

[12] Notably, counsel for Garcia who filed the competing putative class action styled *Williams v. NIBCO*, No. 5-20-cv-48-JKP-RBF, conceded that the named Plaintiffs in *Williams* have all suffered past leaks and yet they also seek to represent both past and future claimants.

line with the findings of NIBCO's expert statistician that the probability of a home developing a new "first," "second," or "third" leak steadily declines as more time passes from the time of installation or date of construction, with the majority of leak activity concluding by May 2025. *See* Dkt. No. 122, Ex. 14. Although Garcia speculates that such a claim period would unfairly exclude recovery for "numerous" homeowners in the class, there's no evidence in the record to support this contention. Indeed, such a claims period is generally consistent with the testimony from Garcia's expert Cynthia Smith who—despite conceding that she has never conducted a statistical analysis on the issue—explained that she had "seen" leaks arising one to 15 years after installation.

Finally, Garcia's contention that the Settlement shortens the term of NIBCO's limited warranty is belied by the Settlement's terms. Under the Settlement Agreement, Settlement Class Members expressly have rights to assert claims under the Limited Warranty for as long as the Limited Warranty applicable to the Covered Products installed in their home remains in effect, even after the Claim Period ends. *See* Settlement Agreement ¶ C. 18.[13] Although the Settlement Agreement specifically excludes design defects from the Limited Warranty, case law supports this interpretation of NIBCO's Limited Warranty.[14]

---

[13] Class members who wish to make a claim under the Limited Warranty after the Claim Period first must contact NIBCO in accordance with the terms of the Limited Warranty. If the class member is dissatisfied with the outcome of that contact, the class member can raise their claim with the Special Master appointed under the Settlement. The cost of the special Master will be borne by NIBCO outside of and in addition to the settlement fund. The decision of the Special Master may be reviewed by this Court upon request of either the class member or NIBCO.

[14] *See, e.g.*, *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-cv-2618-D, 2013 WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013) (explaining "plaintiffs cannot recover for defects not covered by the express warranties" and that a warranty of products "free from defects in material and workmanship . . . does not cover design defects"); *Tull Bros., Inc. v. Peerless Prods., Inc*., 953 F. Supp. 2d 1245, 1257 (S.D. Ala. 2013) (holding that a "written warranty against defects in materials or workmanship does *not* encompass a warranty against defects in design" and dismissing plaintiff's design defect claims) (emphasis in original).

### B.      Rule 23(b) Is Also Satisfied.

In addition to the requirements of Rule 23(a), Plaintiffs must also satisfy Rule 23(b)(3)'s predominance and superiority elements. Specifically, Plaintiffs must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) certification of the Class is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Such is the case here. The single dominant question for all Class members is whether NIBCO's Covered Products were defectively designed or manufactured. This contention can be proven on a class-wide basis, without meaningful individualized issues that predominate. Moreover, class-wide resolution of these claims is far more efficient than requiring approximately 8,000 Class members to file and prosecute individual actions, all of which are based on the same factual and legal theories, and which individually do not involve large enough damages to justify the cost of piecemeal litigation. Indeed, class-wide treatment and approval of the Settlement provide the Class with substantial benefits, while limiting the risks, costs, and delays of litigation. As such, certification is superior to other available methods of resolving the claims of the Class.

Finally, when assessing predominance and superiority, the Court considers that the Class will be certified for settlement purposes only, and that a showing of manageability at trial is not required.[15]

For all these reasons, the Court will finally certify the above class for settlement purposes.

---

[15] *See Amchem*, 521 U.S. at 618 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tired, would present intractable management problems").

### C.    Appointment of Class Representatives and Class Counsel Is Reaffirmed.

The Court previously appointed Plaintiffs David Matson, Barbara Matson, and Yolanda Garret[16] as the Class Representatives of the Settlement Class and hereby reaffirms that appointment. The Court also reaffirms the appointment of Austin Tighe of Nix Patterson LLP; Robert E. Linkin of Munck Wilson Mandala, LLP; J. David Rowe of DuBois Bryant & Campbell LLP; Brandon J. Grable of Grable Grimshaw Mora, PLLC; and Kirby D. Farris of Farris, Riley & Pitt, LLP as Co-Lead Class Counsel.

### II.    Notice Provided Was the Best That Was Practicable under the Circumstances.

Federal Rule of Civil Procedure 23 requires the Court to direct to class members "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The Court finds that the original notice[17] and curative notice authorized by the Court in its June 10 and June 25, 2021, Orders, *see* Dkt. Nos. 106 & 107, constitute: (i) the best notice practicable to the Settlement Class under the circumstances; (ii) were reasonably calculated, under the circumstances, to apprise the Settlement Class of the pendency of this Litigation and the terms of the Settlement Agreement, their right to exclude themselves from the Settlement, or to object to any part of the Settlement, their right to appear at the Final Approval Hearing (either on their own or through counsel hired at their own expense), and the binding effect of the Final Approval Order and the Final Judgment, whether favorable or unfavorable, on all Persons who do not exclude themselves from the Settlement Class, (iii) due, adequate, and sufficient notice to all Persons entitled to receive notice; and (iv) fully satisfy the requirements of the United States

---

[16] Plaintiffs' Second Amended Complaint adds Garret as a class representative. *See* Dkt. No. 52.

[17] Plaintiffs Motion for Final Approval details the various ways notice was effectively distributed to class members. *See* Dkt. No. 121 at 10-12.

Constitution (including the Due Process Clause), Fed. R. Civ. P. 23, and any other applicable law. The Court notes that no objection from a person with standing was submitted concerning the Notice Plan.[18]

Due and adequate notice of the proceedings having been given to the Settlement Class and a full opportunity having been offered to Settlement Class Members to participate in the Final Approval Hearing, it is hereby determined that all Settlement Class Members except those identified in Appendix A attached hereto who submitted a timely and valid Request for Exclusion are bound by this Final Approval Order and the Final Judgment.

### III.    Settlement Approval Is Granted.

Pursuant to Rule 23, a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Before 2018, the Fifth Circuit instructed district courts to consider the following six so-called "*Reed* factors" in determining whether to approve a proposed class settlement: (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings; (4) the plaintiffs' probability of success; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and absent class members. *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). In applying these factors, however, the Court was to remain "mindful of the 'overriding public interest in favor of settlement' in class action suits." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).

---

[18] On June 28, 2021, counsel for plaintiffs in the related *Williams* putative class action filed an objection to the curative notice approved by the Court. *See* Dkt. No. 109. Those objections, however, were overruled for lack of standing and merit. *See* Dkt. No. 127 at 2.

In 2018, Rule 23(e) was amended to provide that a Court may only approve a binding settlement approval after a hearing and "only on finding that it is fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee notes to the 2018 amendments indicate that the changes to the rule are meant to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," rather than "displace any factor" sanctioned by the circuit courts. In light of this explanation and because the Rule 23 and *Reed* factors overlap, this Court will follow the lead of other courts in this circuit and combine these factors in analyzing the proposed Settlement. *See, e.g.*, *ODonnell v. Harris Cty., Tex.*, No. 16-CV-1414, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019).

A careful review of the Rule 23(e)(2) and *Reed* factors reflects that approval of the Settlement is warranted here.

### A.   The Class Representatives and Counsel Have Adequately Represented the Class.

The Court above discussed at length the adequacy of the class representatives and counsel. Accordingly, the Court will not reiterate the analysis here. It is sufficient to say that

ample evidence shows the class has been ably and diligently represented both by counsel and the class representatives.

### B.    The Proposed Class Settlement Was Negotiated at Arm's Length.

The parties here entered the Settlement only after extensive, arm's-length negotiations that took place over the course of a year. Those negotiations included numerous in-person, telephonic, and Zoom settlement conferences. *See* Linkin Decl. (Dkt. No. 121-3) ¶ 11. Ultimately, the parties reached a settlement in principle after mediating the case before an experienced mediator who had resolved the related *Cole* class action. *See id.* ¶ 11-12. It was at the mediation that the parties agreed to create a common fund in the amount of $7.65 million for the benefit of the Class. *See id.* The parties' arms- length negotiations conducted under the close supervision of an experienced mediator are a "strong indicator of procedural fairness." *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 295 (5th Cir. 2017).

After mediation, in a process that took several months and protracted negotiations, Class Counsel focused on negotiating additional benefits for the Class as part of a potential settlement (*i.e.*, the size of initial payments to Class members filing claims, the negotiation of agreements with preferred plumbing-service providers in both Texas and Alabama to perform re-plumbing services for eligible Class members, including significant discounts for plumbing services and available financing terms for Class members). *See* Linkin Decl. ¶ 12. Only after agreement on every material component related to relief for the Class was reached, did the parties agree to finally settle the case. *See id.* ¶ 13. Then, and only then, did Class Counsel and Defendant reach agreement as to a separately paid Class Counsel fee to be approved by this Court, such that Class Members would not be taxed in any way by the payment of attorney's fees—including for the

work Class Counsel will continue to perform through the multi-year administration period called for by the Settlement. *See id.*

In light of the foregoing, and in the complete absence of any evidence or hint of fraud or collusion behind the Settlement,[19] the Court finds that this factor weighs heavily in favor of approval.

### C.   The Relief Is Adequate in Light of the Duration, Costs, Risks, and Delay of Trial and Appeal.

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("[S]ettling now avoids the risks and burdens of potentially protracted litigation."). Here, the parties settled this case over a year and a half after Plaintiffs first sought class-wide relief. Although the Court recognizes that the parties did so without the benefit of the Court's ruling on NIBCO's motion to dismiss, NIBCO has repeatedly denied its liability and proven willing and able to vigorously defend itself against Plaintiffs' claims. Litigating this case through summary judgment and potentially to trial (assuming Plaintiffs could overcome NIBCO's defenses) would've required Plaintiffs to demonstrate their claims through the presentation of complex expert testimony. *See* Linkin Decl. ¶¶ 21-22. And, putting aside the risk of litigation, for Plaintiffs and class members to fully litigate this matter, including any appeals, would've likely taken years. *See id.* ¶ 22. Indeed, the related *Cole* class action was the subject of protracted

---

[19] *See, e.g.*, *Welsh v. Navy Fed. Credit Union*, No. 5:16-CV-1062-DAE, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018) (noting that a court "may presume that a proposed settlement is fair and reasonable, and lacking fraud or collusion, when it is the result of arm's-length negotiation" and further, courts may similarly "presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary").

litigation lasting more than five years before the parties ultimately settled. In contrast, the Settlement provides Class members with immediate financial assistance.

Accordingly, this second factor supports Settlement approval.

> **D.      The Stage of the Proceedings and the Amount of Discovery Completed Support Settlement.**

The next factor involves whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it." *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching: Grades 7-12 Litig*., 447 F.Supp.2d 612, 620 (E.D. La. 2006).

Here, the Court finds the Settlement itself is the product of an informed process that left the parties more than adequately apprised of the merits of each side's case and the fairness of the settlement achieved. That is largely the result of both parties having the benefit of the long and complicated history of the NIBCO PEX litigation that preceded this matter by nearly a decade and involved class-certification briefing, summary judgment briefing, *Daubert* motions, expert reports, as well as discovery produced in the *Matson* Plaintiffs' individual state court litigation. *See* Linkin Decl. ¶¶ 24-25. Plaintiffs also consulted with experts and had access to additional informal discovery produced by Defendant for purposes of arm's length negotiations. *See id.* Similarly, NIBCO had the benefit of the *Matson* Plaintiffs' depositions taken in the Plaintiffs' state court case, the *Cole* discovery, and materials provided by Plaintiffs also as part of the

informal negotiation process. *See id.* In short, the parties were more than adequately informed when negotiating the Settlement.

Garcia, in objecting to the settlement, makes much ado over the fact that the parties didn't conduct much *formal* discovery in this case. But the Fifth Circuit has rejected the proposition that the parties must always undertake extensive formal discovery and build a voluminous record before a suitable settlement can be reached. *See Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). Indeed, cases can be "over discovered," which unnecessarily increases the cost of litigation and only serves to harass the opposing party. *Cotton*, 559 F.2d 1326, 1332. Accordingly, where—as here—the parties have taken affirmative steps to gather the relevant information, and there's no evidence that the settlement itself is the product of uneducated guesswork, the Court may "legitimately presume that counsel's judgment that they achieved the desired quantum of information necessary to achieve a settlement . . . is reliable." *In re Corrugated Container*, 643 F.2d at 211 (quotations omitted). The Court therefore rejects Garcia's contention that the record reflects an inappropriate and uninformed "rush to settlement."

## E. The Probability of Success on the Merits Supports Settlement.

In evaluating the likelihood of success, a district court "must compare its terms with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172. At the same time the court "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Id.* (quotations and brackets omitted). In deciding to settle this matter, class counsel took into account several strong defenses vigorously asserted by NIBCO, including: (1) the relevant statute of limitations, given the age of the class members' homes, the lack of a discovery rule

with respect to breach-of-implied-warranty claims, case law providing that the NIBCO limited warranty doesn't cover design defects, and a growing trend in courts (including the U.S. Supreme Court and courts in Alabama and Texas) to disfavor *American Pipe* tolling or cross-jurisdictional tolling for state law claims asserted in a prior federal court class action;[20] (2) the difficulty in proving class members' reliance on the terms of the warranty so as to fulfill the "basis of the bargain" requirement; and (3) application of the economic loss doctrine, which if successful could have severely limited Class Member damages at trial, including by foreclosing recovery for replacement of the NIBCO Covered Products themselves or repairs for water damage to adjacent areas of the home (which is provided for by the proposed Settlement). *See* Linkin Decl. ¶¶ 15-16. Given these significant potentially meritorious defenses, and considering the purpose of settlement, the Court finds that this factor weighs in favor of approving the Settlement.

Citing the District Court's denial of NIBCO's motion to dismiss in the related putative class action styled *Williams v. NIBCO*, No. 5-20-cv-48-JKP-RBF, as well as a few other district court opinions denying motions to dismiss in similar circumstances, Garcia accuses the parties of "overstating" the strength of NIBCO's defenses. But for purposes of a motion to dismiss, the

---

[20] Although Garcia correctly argues that Texas law *generally* recognizes tolling, it's not clear that Texas law permits cross-jurisdictional tolling, *i.e.*, tolling of state-barred claims by an earlier-filed federal court action in a different state, as Plaintiffs attempt to apply here. *See, e.g.*, *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 720-22 (S.D. Tex. 2006) (noting that *American Pipe* tolling limited to federal claims asserted after federal class action and that Texas state law claims would not be tolled under *American Pipe*); *Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 757-58 (Tex. App.—Amarillo 1995, writ denied) (holding that pendency of putative federal class action did not toll Texas statute of limitations applicable to state law claims and noting, "[w]e do not agree that *American Pipe* operates to toll our state statute of limitations").

Court must accept a plaintiff's the factual allegations as true. Accordingly, a denial of NIBCO's motion to dismiss in no way predicts that Plaintiffs will ultimately prevail on the merits.[21]

### F.  The Range and Certainty of Recovery Weigh in Favor of Settlement Approval.

The next factor requires the district court to determine "the value of the settlement in light of the potential for recovery." *Welsh v. Navy Fed. Credit Union*, No. 5:16-CV-1062-DAE, 2018 WL 7283639, at *13 (W.D. Tex. Aug. 20, 2018) (quotations omitted). But when considering the possible range of recovery, a court should keep in mind that "compromise is the essence of settlement." *Id.* (quotations omitted). This is because a settlement must be evaluated "taking into account the uncertainty and risks involved in litigation" and "in light of the strength of the claims and possible defenses." *Id.* (quotations omitted).

Taking into account the risks of litigation faced by Plaintiffs (discussed briefly above as well as in the parties' briefing), the Court finds that the range of recovery contemplated by the Settlement is fair and adequate. The Settlement provides a minimum recovery to Settlement Class members with qualifying claims of 50% of the damages they might have received with an expectation that Settlement Class members may receive an uplift up to 75% of their claimed damages. Additionally, for those Settlement Class members with sufficient qualifying leaks, the Settlement provides a re-plumb remedy with the additional option of utilizing discounted services by preferred plumbing providers in Texas and Alabama at an approximate 15% discount from their standard rates offered to homeowners, such that the actual value of the Settlement for Class members who chose this option exceeds both the 50% floor and 75% ceiling.

---

[21] *See, e.g.*, *Williams v. NIBCO*, No. 5-20-48-JKP-RBF, Dkt. No. 36 at 25 (emphasizing that in denying NIBCO's motion to dismiss, "[t]he Court is not deciding that Plaintiff will ultimately succeed on any claim").

There's no merit to Garcia's objection that the Settlement fund is grossly underfunded. The unrebutted statistical evidence demonstrates the adequacy of the Settlement fund to meet the class members' claims. *See, e.*g., Dkt. No. 122 at 38-46 (discussing the submitted claims to-date at Ex. 4, the number of leaks to date at Ex. 1, and NIBCO's statistician's report at Ex. 14). Moreover, the payments to eligible Settlement Class Members can't be calculated on a per-home basis, as Garcia suggests, because not all homes have experienced or will experience a leak or require a replumb.[22] At the heart of Garcia's objection rests his mistaken belief that nothing short of a complete re-plumb of every class member's home could be adequate here. But this argument neglects to consider the uncertainty and risks involved in litigation and that a settlement represents a compromise. *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 656 (N.D. Tex. 2010), as modified (Jun. 14, 2010) ("Parties give and take to achieve settlements. Typically neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the Court to enter absent the settlement."). Further, in determining whether this Settlement is fair in light of the potential range of recovery, the Court notes that "the fact that a proposed settlement only amounts to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Welsh*, 2018 WL 7283639, at *13 (quotations, brackets, and ellipses omitted). Indeed, "a satisfactory settlement could amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* (quotations and ellipses omitted). And far from offering "a fraction of the potential recovery," this Settlement provides significant benefits to the class members. Notably, the Settlement either meets or exceeds the finally approved settlement in *Cole* in many material respects, perhaps every material respect. *See Cole v. NIBCO*, No. 13-cv-07871-FLW-TJB (D.N.J.), Dkt. No. 227;

---

[22] Indeed, according to Plaintiffs, the majority of Texas class members have reported zero leaks through the end of 2020. *See* Dkt. No. 82-2 ¶¶ 5, 8-11.

*see also* Dkt. No. 121 at 3 (highlighting the additional benefits secured by Plaintiffs in this case compared to those in *Cole*).

       **G.**      **The Opinions of the Participants, Including Class Counsel, Class Representatives, and the Absent Class Members Favor Approval.**

The Settlement is supported by Class Counsel, class representatives, and the vast majority of the class members. Indeed, approximately 8,070 class members declined to opt out, and only one class member has submitted an objection. *See* Ex. 4 to Dkt. No. 122 (Angeion Decl.) at ¶¶ 34-35. Accordingly, this factor favors approval.[23]

       **H.**      **The Proposal Treats Class Members Equitably in Relation to Each Other.**

As discussed above, all class members are entitled to the same relief depending on the number of qualifying leaks they suffer. Accordingly, this factor supports approving the Settlement. *See Hays v. Eaton Grp. Att'ys, LLC*, No. 17-CV-88, 2019 WL 427331, at *13 (M.D. La. Feb. 4, 2019) (the equitable-treatment factor "easily met as each class member, save the Class representative, will receive the same amount").

For all these reasons, the Court finds that the Settlement is fair, reasonable, and adequate, and it is in the best interests of the Settlement Class under Rule 23(e) and the governing case law. Thus, pursuant to Fed. R. Civ. P. 23(e), the Court hereby finally approves in all respects the

---

[23] *See, e.g.*, *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 346 (N.D. Tex. 2011) ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'") (quoting *Cotton*, 559 F.2d at 1330); *Billitteri v. Sec. Am., Inc.*, No. 3:09-CV-01568-F, 2011 WL 3586217, at *14 (N.D. Tex. Aug. 4, 2011) (holding 1% opt-out rate of 30 out of over 2,000 class members "suggests a favorable opinion by the absent class members"); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 961, 976 (E.D. Tex. 2000) (holding 30 objections in a "class of thousands" constituted a "conspicuous absence of substantial objections" supporting approval of the settlement).

Settlement. Accordingly, the Settlement shall be consummated in accordance with its terms and provisions and as further discussed herein.

## IV.    Service Awards and Attorneys' Fees Are Warranted.

Plaintiffs seek an award of $20,000 split evenly between Plaintiffs David and Barbara Matson and Yolanda Garret (*i.e.*, $10,000 for the Matsons and $10,000 for Ms. Garret). The Court finds that this award is appropriate under the circumstances of this case and adequately will compensate Plaintiffs for the service they provided in this action and the burdens they shouldered. *See, e.g.*, *Welsh*, 2018 WL 7283639 at *15 ("Courts have consistently found incentive awards are an efficient and productive way to encourage members of a class to become class representatives"). Moreover, permitting Plaintiffs to recover a service award here won't tax class members; NIBCO has agreed to separately pay this amount.   Accordingly, Plaintiffs' request for a service award is granted.

The Court notes that Class Counsel also seek $2,330,000 in attorneys' fees—to be paid separately by NIBCO—for their efforts in this litigation. Rule 23(h) authorizes a district court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Court finds that fees are appropriate, particularly in light of Class Counsel's diligent efforts here and the result obtained. Nevertheless, the Court "must scrutinize the agreed-to fees" and not "merely ratify a pre-arranged compact." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) (quotations omitted). The Court will therefore address the reasonableness of Class Counsel's fee request by separate order.

## V.    A Dismissal of Claims, Release, and Injunction are Ordered.

Having finally approved the parties' Settlement, it is **ORDERED** as follows:

1.       This case is hereby dismissed with prejudice on the merits and without costs to

any Party or Person, except as otherwise provided herein or in the Settlement Agreement or by separate order. A separate final judgment shall issue.

2.      The Court finds and confirms that the Settlement Escrow Account is a "qualified settlement fund" as defined in Section 1.468B-1 through 1.468B-5 of the Treasury Regulations.

3.      The Court shall retain continuing jurisdiction over the Settlement Escrow Account, pursuant to Section 1.468B-1(c)(1) of the Treasury Regulations.

4.      Under the "relation back" rule provided under Section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that NIBCO and the Settlement Administrator may jointly elect to treat the Settlement Escrow Account as coming into existence as a "qualified settlement fund" on the latter of the date the Settlement Escrow Account meets the requirements of Paragraph VI of the Preliminary Approval Order or January 1 of the calendar year in which all of the requirements of Paragraph VI of the Preliminary Approval Order are met. If such a relation-back election is made, the assets held in the Settlement Escrow Account on such date shall be treated as having been transferred to the Settlement Escrow Account on that date.

5.      Upon the Effective Date, all Settlement Class Members, as well as any Person who receives any payment from the Net Settlement Fund, on behalf of themselves and their agents, heirs, executors and administrators, successors, assigns, insurers, attorneys, representatives, and any and all Persons who seek to claim through or in the name or right of any of them (but excluding any Persons who timely opted out of the Settlement with regard to the buildings or geographic scope for which they opted out) (the "Releasing Parties"), release and forever discharge (as by an instrument under seal without further act by any Person, and upon good and sufficient consideration), NIBCO, its administrators, insurers, reinsurers, agents, firms, parent companies/corporations, sister companies/corporations, subsidiaries and affiliates,

27

and any sales agents and distributors, wholesalers, retailers, plumbers, homebuilders, developers, contractors, engineers, architects, and any other product or service provider or any other party in the chain of distribution who distributed, specified, recommended, sold, and/or installed the Tubing, Fittings, and/or Clamps, and all of the foregoing Persons' respective predecessors, successors, assigns and present and former officers, directors, shareholders, employees, agents, attorneys, and representatives (collectively, the "Released Parties"), from each and every claim of liability, on any legal or equitable ground whatsoever, including relief under federal law or the laws of any state, regarding or related to NIBCO's Tubing, Fittings, and/or Clamps, including without limitation their design, manufacture, purchase, use, marketing, promotions, sale, or certification, and including without limitation all past, present, or future claims, damages, or liability on any legal or equitable ground whatsoever, and regardless of whether such claims might have been or might be brought directly, or through subrogation or assignment or otherwise, on account of or related to the Tubing, Fittings, and/or Clamps, which were alleged or could have been alleged in the Complaints filed in the Litigation. The Release is as a result of membership as a Settlement Class Member, status as Releasing Parties, the Court's approval process herein, and the occurrence of the Effective Date, and is not conditional on receipt of payment by any particular member of the Settlement Class or Releasing Party. Without in any way limiting its scope, and, except to the extent otherwise specified in the Settlement Agreement, the Release covers by example and without limitation, any and all claims for reasonable attorneys' fees, costs, expert fees, consultant fees, interest, litigation fees, costs, or any other fees, costs, and/or disbursements incurred by any attorneys, Class Counsel, Plaintiffs, Settlement Class Members, or any Releasing Party who claim to have assisted in conferring the benefits under this Settlement upon the Settlement Class. The

Settlement Agreement and the Release provided for herein shall not and are not intended to release the claims of the Releasing Parties against the suppliers of raw materials, components, or ingredients used in the manufacture of the Tubing, Fittings, and/or Clamps, which the Releasing Parties hereby fully and forever assign, transfer, and convey to NIBCO. For purposes of any claims by NIBCO against the suppliers of raw materials, components, or ingredients used in the manufacture of the Tubing, Fittings, and/or Clamps, should such supplier seek to join any Releasing Party in such a claim, NIBCO shall defend, indemnify, and hold harmless the Releasing Party from any and all claims of any such supplier against the Releasing Party.

6.      All personal injury claims are expressly excluded from the Release; for the avoidance of doubt, however, claims for emotional distress and/or mental anguish are subject to the Release in Paragraph 34 of the Settlement Agreement and not part of this personal injury exclusion. In addition, subject to the terms of Paragraph 34 of the Settlement Agreement, the Parties further agree that certain limited claims as specified below, which a Releasing Party has brought or may in the future bring against an installer, plumber, homebuilder, contractor, or other product or service provider, or any other party in the chain of distribution who purchased, specified, recommended, sold, and/or installed the Tubing, Fittings, and/or Clamps, related solely and exclusively to the alleged faulty installation of the Tubing, Fittings, and/or Clamps, are expressly not released as to such Persons. This limited exception shall include only claims alleging that a party or parties other than NIBCO are wholly responsible for a leak of the Tubing, Fittings, or Clamps, including, without limitation, as a result of (1) a penetration of the Tubing, Fittings, and/or Clamps from a foreign object such as a nail or other physical abuse; (2) improper attachment of the Tubing, Fittings, and/or Clamps to plumbing components or appliances; (3) improper stress on the Tubing, Fittings, and/or Clamps due to improper

installation; (4) leaks due to an improperly set or malfunctioning pressure-reducing valve not manufactured or sold by NIBCO; (5) leaks due to age of fixture sealant components supplied or provided by a plumber; or (6) any installation issue in violation of NIBCO's installation guidelines and/or unrelated to the design, manufacture, performance, or selection of the Tubing, Fittings, and/or Clamps. However, if a court finds, via dispositive motion or otherwise, that NIBCO was at least partially responsible, then this limited exception shall not apply and the claim is released under Paragraph 34 of the Settlement Agreement. Nothing in this Paragraph shall permit any Releasing Party to bring any other claims released herein, including without limitation claims for improper, insufficient, or negligent advice, recommendation, solicitation, purchase, selection, or sale of the Tubing, Fittings, and/or Clamps, and in no event shall any claim whose prosecution is permitted by this Paragraph allege, purport to allege or depend on any wrongful act, error or omission, loss, or liability, whether strict, or due to fault or otherwise, by NIBCO. The Releasing Parties and NIBCO do not intend to create and do not believe that the reservation provided in this Paragraph creates any basis for a claim of indemnification, contribution, or any other claim, however denominated, by a nonparty against the Released Parties, with the exception that, as described in Paragraph 34 of the Settlement Agreement, parties who opted out of the Settlement do not release their ability to assert indemnification, contribution, and any other claim however denominated against Released Parties. This provision is intended solely to preserve a Releasing Party's ability to seek relief against the non-released individuals or entities for liability unrelated to NIBCO as expressly specified in this Paragraph.  In addition, the Releasing Parties agree that in any action brought by a Releasing Party alleging that a party or parties other than NIBCO are wholly responsible for a leak of the Tubing, Fittings, or Clamps, including, but not limited to, based on a leak that is not

a Qualifying Leak, should any such third party sued by a Releasing Party file a claim or cause of action against any Released Party for contribution, indemnification, or any other claim, however denominated, arising out of or related to the Tubing, Fittings, and/or Clamps, the Releasing Parties shall hold NIBCO and the Released Parties harmless, agree to a judgment in NIBCO's and the Released Parties' favor dismissing all claims asserted by the Releasing Party or anyone claiming by, through, or under the Releasing Party, and to the extent that the claims against NIBCO or the Released Parties are not released, then reduce or remit any judgment against such third party by the percentage, amount, or share necessary under applicable law to fully discharge and relieve NIBCO and the Released Parties of liability to such third party for claims for contribution, indemnification, or any other claim, however denominated, including attorneys' fees and costs such Person may seek against NIBCO and the Released Parties. If a Releasing Party files a claim or cause of action against any third party alleging that a party or parties other than NIBCO are wholly responsible for a leak of the Tubing, Fittings, or Clamps, including, but not limited to, based on a leak that is not a Qualifying Leak, the Releasing Party must not include any claim or allegation for design defects, manufacturing defects, marketing defects, or any other claim that is a "products liability action," as contemplated by Section 82.001(2) of the Texas Civil Practice and Remedies Code. The Releasing Party also must include the following language in the complaint, petition, or other document asserting the claim: "This is not a 'products liability action' as defined in Section 82.001(2) of the Texas Civil Practice & Remedies Code. The plaintiff does not allege design, manufacturing, or marketing defects in the plumbing system or any of its component parts. The plaintiff expressly waives any products liability action it may have associated with NIBCO's Tubing, Fittings, and/or Clamps. The plaintiff's claims are not product-based, but instead are based on services

provided by the defendants. The plaintiff solely seeks damages resulting from the negligent installation of the plumbing system into the home." In any event, however, the Releasing Parties' obligation is limited to releasing, reducing, or remitting in an amount no more than the amount of the judgment against NIBCO or the Released Parties. If any third party sued by a Releasing Party obtains a judgment against NIBCO or any Released Party for contribution, indemnification, or any other claim, however denominated, the Releasing Party agrees that the Releasing Party shall reduce or remit its judgment against such third party by the amount of such third party's judgment against NIBCO and the Released Party not to exceed the amount of that portion of the judgment for which such third party obtains contribution, indemnification, or other relief, however denominated, so as to fully satisfy such third party's judgment against NIBCO and the Released Party including attorneys' fees and costs such third party may seek against NIBCO and the Released Party. In any settlement between any of the Releasing Parties and any Person arising out of or related to NIBCO's Tubing, Fittings, and/or Clamps, the Releasing Parties shall be deemed to have obtained a release in favor of all Released Parties.

7.     Settlement Class Members have knowingly and voluntarily waived the provisions of Section 1542 of the California Civil Code (to the extent applicable), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Plaintiffs and the Settlement Class Members, on behalf of all Releasing Parties, expressly waive and relinquish any and all rights and benefits that they may have under, or that may be

conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory that is similar, comparable or equivalent to Section 1542, to the fullest extent they may lawfully waive such rights or benefits pertaining to the Released Claims. In connection with such waiver and relinquishment, the Settlement Class Members hereby acknowledge that the Releasing Parties are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those that they now know or believe exist with respect to Released Claims, but that it is their intention to hereby fully, finally, and forever settle and release all of the Released Claims known or unknown, suspected or unsuspected, that they have against the Released Parties. In furtherance of such intention, the Release herein given by the Releasing Parties to the Released Parties shall be and remain in effect as a full and complete general release notwithstanding the discovery or existence of any such additional different claims or facts. Each of the Parties expressly acknowledges that it has been advised by its attorneys of the contents and effect of Section 1542, and with knowledge, each of the Parties hereby expressly waives whatever benefits it may have had pursuant to such section. Plaintiffs acknowledge, and the Releasing Parties shall be deemed by operation of the Final Approval Order and the Final Judgment to have acknowledged, that the foregoing waiver was expressly bargained for and a material element of the Settlement of which this Release is a part.

8.      The Court orders that, upon the Effective Date, the Settlement Agreement shall be the exclusive remedy for any and all Released Claims. The Court thus hereby permanently bars and enjoins Plaintiffs, all Settlement Class Members (except those identified in Exhibit A attached hereto), and all Persons acting on behalf of, or in concert or participation with such Plaintiffs or Settlement Class Members (including but not limited to the Releasing Parties),

from: (a) filing, commencing, asserting, prosecuting, maintaining, pursuing, continuing, intervening in, or participating in, or receiving any benefits from, any lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based upon or asserting any of the Released Claims against any Released Party; (b) bringing a class action on behalf of Plaintiffs or Settlement Class Members, seeking to certify a class that includes Plaintiffs or Settlement Class Members, or continuing to prosecute or participate in any previously filed and/or certified class action, and/or in any lawsuit based upon or asserting any of the Released Claims. Pursuant to 28 U.S.C. §§ 1651(a) and 2283, the Court finds that issuance of this permanent injunction is necessary and appropriate in aid of its continuing jurisdiction and authority over the Settlement Agreement and the Litigation.

9.      Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations, or proceedings connected with it, nor any of the documents or statements referred to therein, nor any of the documents or statements generated or received pursuant to the claims administration process, shall be:

      a.      offered by any Person or received against NIBCO or any Released Party as evidence or construed or deemed as evidence of any presumption, concession, or admission by NIBCO or any Released Party of the truth of the facts alleged by the Plaintiffs or any Settlement Class Member or the validity of any claim that has been or could have been asserted in this Litigation or in any litigation, or other judicial or administrative proceeding, or the deficiency of any defense that has been or could have been asserted in this Litigation or in any litigation, or of any liability, negligence, fault or wrongdoing of NIBCO or any Released Party;

      b.      offered by any Person or received against NIBCO or any Released Party

as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by NIBCO or any Released Party or any other wrongdoing by NIBCO or any Released Party; or

        c.     offered by any Person or received against NIBCO or any Released Party as evidence of a presumption, concession, or admission with respect to any default, liability, negligence, fault, or wrongdoing, or in any way interpreted, construed, deemed, invoked, offered, received in evidence, or referred to for any other reason against any of the settling parties, in any civil, criminal, or administrative action or proceeding; provided, however, that nothing contained herein shall prevent the Settlement Agreement (or any agreement or order relating thereto) from being used, offered, or received in evidence in any proceeding to approve, enforce, or otherwise effectuate the Settlement (or any agreement or order relating thereto), the Final Approval Order, or the Final Judgment, or in which the reasonableness, fairness, or good faith of the Parties in participating in the Settlement (or any agreement or order relating thereto) is an issue, or to enforce or effectuate provisions of the Settlement, the Final Approval Order, the Final Judgment, or the Release as to NIBCO, the Released Parties, Plaintiffs, or the Settlement Class Members.

**VI.**     **Other Matters Are Also Addressed.**

1.     Ross Hart, Esquire, of the Arbitration Mediation Conciliation Center is hereby appointed as the Special Master.

2.     Todd J. Menna of Element Materials Technology is hereby appointed as the Independent Engineering Consultant.

3.      The Court has jurisdiction to enter this Final Approval Order, the forthcoming order approving attorneys' fees, and the Final Judgment. Without in any way affecting the finality of this Final Approval Order or the Final Judgment, this Court expressly retains exclusive and continuing jurisdiction over the Settlement, including all matters relating to the administration, consummation, validity, enforcement and interpretation of the Settlement Agreement, the Final Approval Order, or the Final Judgment, including, without limitation, for the purpose of:

        a.      enforcing the terms and conditions of the Settlement and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, the Final Approval Order, or the Final Judgment (including, whether a Person is or is not a Settlement Class Member);

        b.      entering such additional orders, if any, as may be necessary or appropriate to protect or effectuate the Final Approval Order, the Final Judgment, or the Settlement Agreement, or to ensure the fair and orderly administration of the Settlement; and

        c.      entering any other necessary or appropriate orders to protect and effectuate this Court's retention of continuing jurisdiction over the Settlement, the Final Approval Order, or the Final Judgment.

4.      Without affecting the finality of this Final Approval Order or the Final Judgment, NIBCO and each Settlement Class Member hereby irrevocably submits to the exclusive jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of or relating to the Settlement or the applicability of the Settlement Agreement, including any suit, action, proceeding, or dispute relating to the Release provisions herein.

5.      The Parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Settlement Agreement.

6.      Without further order of the Court, the Parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement. Likewise, the Parties may, without further order of the Court or notice to the Settlement Class, agree to and adopt such amendments to the Settlement Agreement (including exhibits) as are consistent in material respects with this Final Approval Order and the Final Judgment and that do not limit the rights of Settlement Class Members under the Settlement Agreement.

7.      In the event that the Effective Date does not occur, certification of the Settlement Class shall be automatically vacated and the Final Approval Order and Final Judgment, and all other orders entered and releases delivered in connection herewith, shall be vacated and shall become null and void.

**IT IS SO ORDERED**.

SIGNED this 20th day of October, 2021.


_____
RICHARD B.  FARRER
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

| No. | Exclusion | First Name | Last Name | First Name (2) | Last Name (2) | City | State |
|---|---|---|---|---|---|---|---|
| 1 | 5/10/2021 | MELISSA | CAREY | JAMES JUSTIN | CAREY | SAN ANTONIO | TX |
| 2 | 5/12/2021 | CHRISTIANSON AIR CONDITIONING AND PLUMBING LLC | | | | ROUND ROCK | TX |
| 3 | 5/12/2021 | DUPREE PLUMBING CO INC | | | | MARIETTA | GA |
| 4 | 8/10/2021 | JAMES | SANFORD | | | NORTHPORT | AL |
| 5 | 8/10/2021 | ISABEL | ERMIS | | | SAN ANTONIO | TX |
| 6 | 8/10/2021 | APRIL | DINGESS | | | CONVERSE | TX |
| 7 | 8/10/2021 | ANGELA | REYNOLDS | | | SPRINGVILLA | AL |
| 8 | 8/10/2021 | RONDA MARRS | HOLT | | | SCHERTZ | TX |
| 9 | 8/10/2021 | MICAH J | OSER | MARGARET | OSER | SCHERTZ | TX |
| 10 | 8/10/2021 | MARY | MENDEZ | | | SAN ANTONIO | TX |
| 11 | 8/10/2021 | STEPHEN | LUCERO | YVETTE MONIQUE | LUCERO | CILBOLO | TX |
| 12 | 8/10/2021 | ROGELIO V | ROSAS JR | | | SAN ANTONIO | TX |
| 13 | 8/10/2021 | DOLORES C | ROBINSON | | | SAN ANTONIO | TX |
| 14 | 8/10/2021 | HECTOR | SIGALA | | | SAN ANTONIO | TX |
| 15 | 8/10/2021 | KIMBERLY K | MEYERS | | | SCHERTZ | TX |
| 16 | 8/10/2021 | SYLVIA | GREENWOOD | | | CONVERSE | TX |
| 17 | 8/10/2021 | KRISTEN | SHAY | | | SAN ANTONIO | TX |
| 18 | 8/10/2021 | JOYCE A | WILSON | | | SAN ANTONIO | TX |
| 19 | 8/10/2021 | RUBEN | SOTO JR | YOLANDA | SOTO | SAN ANTONIO | TX |
| 20 | 8/10/2021 | CHAJUANN CHAMBERS | LITTLEFIELD | | | SCHERTZ | TX |
| 21 | 8/10/2021 | FREDY | GUZMAN | | | SAN ANTONIO | TX |
| 22 | 8/10/2021 | MICHALLE | ENGLER | | | SAN MARCOS | TX |
| 23 | 8/10/2021 | CHERYL L | JOHNSON | | | BESSEMER | AL |
| 24 | 8/10/2021 | ELIZABETH A | COLGAN | | | SAN MARCOS | TX |
| 25 | 8/10/2021 | RAUL | VERA SR | | | SEGUIN | TX |
| 26 | 8/10/2021 | TRACEY | THOMAS | | | MOODY | AL |
| 27 | 8/10/2021 | MEREDITH | PLY | | | SAN MARCOS | TX |
| 28 | 8/10/2021 | THERESA | HARPER | GEORGE E | HARPER JR | SCHERTZ | TX |
| 29 | 8/10/2021 | LAURIE | DAVIS | | | SA | TX |
| 30 | 8/10/2021 | SHIRLEY JEAN | WOOTEN | | | SAN ANTONIO | TX |
| 31 | 8/10/2021 | GARCIA | MICHAEL P | | | WAXAHACHIE | TX |
| 32 | 8/10/2021 | TROY | BLAPPERT | UNJU | BLAPPERT | SAN ANTONIO | TX |
| 33 | 8/11/2021 | MATTHEW | GRAHAM | | | SCHERTZ | TX |